FILED
United States Court of Appeals
Tenth Circuit

July 30, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ESTATE OF JOSEPH VALVERDE, by
and through Isabel Padilla, as personal
representative,

     Plaintiff - Appellee,

v.

JUSTIN DODGE,

     Defendant - Appellant.

No. 19-1255

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-01703-MSK-MEH)**
_____

Michele A. Horn (Wendy J. Shea and Conor D. Farley, with her on the briefs), Denver
City Attorney's Office, Denver, Colorado, for Defendant-Appellant.

Eric Valenzuela (Dale K. Galipo, with him on the brief), Law Offices of Dale K. Galipo,
Woodland Hills, California, for Plaintiff-Appellee.
_____

Before **HARTZ**, **MATHESON**, and **CARSON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Denver Police Sergeant Justin Dodge fatally shot Joseph Valverde after he saw

Valverde pull out a gun as a SWAT team arrived to arrest him after an undercover drug

transaction. Plaintiff Isabel Padilla, as personal representative of Valverde's estate, sued

Dodge under 42 U.S.C. § 1983, asserting that Dodge used excessive force in violation of Valverde's Fourth Amendment rights. Dodge moved for summary judgment on the basis of qualified immunity, but the district court denied the motion. It said that (1) a reasonable jury could find that Valverde had discarded the gun and was in the process of surrendering before Dodge shot him and (2) the use of deadly force in that situation would violate clearly established law.

Dodge appeals. We have jurisdiction under 28 U.S.C. § 1291 and reverse the denial of summary judgment. Dodge is entitled to qualified immunity because he had only a split second to react when Valverde suddenly drew a gun. He did not violate the Fourth Amendment by deciding to shoot without waiting to see whether Valverde was merely taking the gun from his pocket to toss away rather than to shoot an officer. And to the extent that Plaintiff is arguing that Dodge should be liable because he recklessly created the situation that led to the apparent peril, Dodge is entitled to qualified immunity because he did not violate clearly established law.

## I.  BACKGROUND

### A.  The Shooting

On the afternoon of July 2, 2014, Valverde planned to buy two kilograms of cocaine at Overland Public Park in Denver, Colorado, from a man to whom he had previously sold guns (including AK-47s) unlawfully. Unbeknownst to Valverde, this man was undercover detective Fabian Rodriguez with the Adams County Sheriff's Office, who was working with the Metro Gang Task Force (MGTF), a multi-agency law-enforcement organization

2

targeting gang members in the Denver area. During their last gun transaction Valverde had told Rodriguez that he was a cocaine dealer but that his drug supplier had disappeared, and he asked Rodriguez if he knew anyone who could provide cocaine. Rodriguez stated that he knew some people in the cocaine business, and they arranged for a purchase of two kilograms—setting in motion the July 2 meeting, at which the MGTF planned to arrest Valverde. (An operation in which an undercover officer sells contraband to a suspect is called various names, including reverse buy-bust.)

A Denver Police Department (DPD) SWAT unit was assigned as the arrest team. The unit typically deploys in high-risk situations, such as when the suspect is known to be violent, a higher-level drug dealer, or the target of a bust operation. Dodge was the team supervisor for the assigned SWAT unit, which included five other officers, one of whom was a K-9 officer with his dog.

The SWAT team met a few hours before the operation to go over the details of the tactical plan. The plan called for the SWAT team to enter the parking lot in an unmarked van and then move in quickly to take Valverde into custody once he attempted to buy the cocaine from Rodriguez and Rodriguez gave the bust signal. Dodge was to be the driver and would have a semi-automatic carbine and a "less-lethal" 40-millimeter gun available as an option. The K-9 officer's primary responsibility was the dog, also a less-lethal option. Three of the other four officers were armed with M4 carbines and one carried a pistol. These four officers were to deploy out of the van first, in two 2-man teams. They would move toward Valverde and pin him in from different sides, with the lead officers of each two-man team approaching with their weapons drawn. The tactical plan provided

3

for the possibility that Valverde would decide to flee (the team would deploy the canine) or stay put in his vehicle (Dodge would block Valverde in with the SWAT van), or if the situation unfolded in some other unexpected way. The SWAT team was told during the briefing that Valverde had a gang affiliation, had previously been involved in illegal gun sales, and was known to carry a weapon and might be armed that day.

The reverse-buy-bust operation began as planned. Valverde arrived at the park's parking lot as expected and attempted to purchase the cocaine from undercover detective Rodriguez. Once Rodriguez gave the bust signal the SWAT team moved in to arrest Valverde, pulling up by the sidewalk in an unmarked white van. But less than seven seconds after the first SWAT team members exited the van, Valverde had been shot by Dodge and was on the ground.

The FBI conducted aerial aircraft surveillance of Valverde that recorded video footage, without sound, of the operation. That footage is included in the record. Also, Rodriguez was wired with a sound recording device during the transaction, and another detective prepared a recording that synchronized the audio and video recordings. That recording is also part of the record on appeal. To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony. *See Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) ("While a court considering a summary judgment motion based upon qualified immunity usually must adopt the plaintiff's version of the facts, that is not true to the extent that there is clear contrary video evidence of the incident at issue." (brackets, ellipses, and internal quotation marks omitted)).

4

Rodriguez had parked his SUV in a parking space perpendicular to the sidewalk bordering the park, with a vacant parking space between his car and the closest parked car. (Valverde had arrived with his girlfriend in a white pickup truck, and she parked it on the other side of the lot across from where the shooting occurred.) The two men were on the sidewalk bordering the vacant space. From their vantage point facing the parking lot, a sedan was in the parking space to their left and Rodriguez's SUV in the space to their right. The police van arrived from their right. Valverde said "who's that" to Rodriguez as the van drove toward them, and Rodriguez responded that he did not know. Dodge was not able to hear any of Valverde's conversation with Rodriguez because the SWAT team had real-time access only to the FBI's aerial video feed, not the audio from Rodriguez's wire. But Dodge could see that Valverde was looking at the van as it pulled up.

As the van slowed and came to a stop between the sedan and the SUV, the SWAT team officers began deploying. The following diagram shows the position of the vehicles, Valverde, and Rodriguez:



Two of the officers exited from the passenger-side sliding door, heading toward the far side of the sedan. The K-9 officer and his dog immediately followed them. The lead officer threw a flash-bang device while exiting. According to Dodge, the purpose of the noise and smoke of the flash bang was "to try to prevent shootings"— to "distract the suspect away from any ill intent or trying to obtain a weapon and then use that weapon . . . ." Aplt. App., Vol. I at 209; *see also id.* at 226 (testimony of SWAT team member Bollwahn) (purpose of flash bang is "to distract the intended person or persons to gain compliance from them, so they don't think about pulling a gun or shooting a gun or anything [else] dangerous"). The front two officers approached Valverde from his left, going around the passenger side of the sedan, while the K-9 officer and his dog trailed behind.

The other two-man team exited from the back of the van about a second after the first team, just as the flash bang went off and billowed white smoke. They approached from Valverde's right, beginning to circle around the driver's side of the SUV. Rodriguez had scrambled away from Valverde and thrown himself face down on the ground in front of the SUV.

About the same time, Dodge exited the van from the driver's side door (the side closest to the two parked cars and Valverde). He had armed himself with his semi-automatic carbine, as opposed to the less lethal 40-millimeter gun, because he believed Valverde would have a gun.

As Dodge exited, one or more of the other officers ordered Valverde, who was facing the van, to raise his hands. Valverde did not immediately comply; he appeared to

6

flinch or jump slightly backward in reaction to the flash bang. Dodge headed directly toward Valverde, moving through the empty parking space between the parked SUV and sedan.

None of the officers identified themselves as police. The officers were wearing green SWAT uniforms rather than the typical blue DPD uniforms. Their vests did, however, have a DPD badge and the word "Police" across the chest.

Although officers surrounded Valverde and yelled at him to put his hands up and get down, he moved slightly forward and then slid to his left, in front of the right front tire of the parked sedan. He stood angled toward Dodge, who was next to the driver's side door of the sedan. Dodge said that he saw Valverde keep grabbing for something in his pocket or waistband area. The two-man team circling the sedan and Rodriguez, who had turned over on the ground so that he could face Valverde, also observed Valverde reaching for something in his shorts. Valverde then pulled out a gun with his right hand, at waist level. Directly facing Valverde from across the hood of the sedan, Dodge saw the muzzle of a gun. Rodriguez and the lead officer coming from the left, around the hood of the SUV, also saw the gun. The lead officer yelled to his partner that Valverde had a gun; he did so because his partner had not yet cleared the SUV and therefore would not be able to see Valverde or that Valverde was armed. The officers coming from Valverde's left, around the sedan, did not see a gun.

Less than a second after Valverde pulled out this gun, Dodge fired his carbine at Valverde five times in rapid succession. Three of the five shots struck Valverde—one in his right chest, one in the back of his right elbow, and one in his right back. Dodge gave

7

no verbal warning that he was going to shoot, or any other warning or command to drop the gun and surrender. Nor did he alert the SWAT team that he was going to exit the van, or that he planned to do so with a carbine instead of the 40-millimeter gun available to him. None of the other officers fired a shot. About four seconds elapsed from the time Dodge stepped out of the van to the time Valverde went to the ground.

There is no dispute that Valverde drew a gun, and that Dodge saw Valverde take the gun out before using deadly force. But Plaintiff asserts that the video footage clearly shows that "[Valverde] never pointed a gun at Dodge or any other officer during the incident, [Valverde] voluntarily discarded the gun onto the ground (while he was standing up) and then raised his visibly empty hands up near his head (all in one motion) prior to the shooting, and [Valverde] was in this position when the shooting began. [Valverde] did not have a gun in his hand when the shooting occurred." Aplee. Br. at 11–12 (citations omitted). Finally, Plaintiff contends that the video and the fact that Valverde was shot in the back and the back of his right elbow, show that Valverde was going to the ground and already on the ground for at least some of the gunshots.

After Valverde fell to the ground one of the officers immediately handcuffed him. On the ground, by the right front tire of the sedan, officers found the gun that Valverde had dropped. Valverde died from his wounds.

## B.  Procedural History

Plaintiff filed suit in the United States District Court for the District of Colorado against Dodge and the City and County of Denver, asserting a Fourth Amendment excessive-force claim under § 1983 against Dodge and a municipal-liability claim under

8

§ 1983 against Denver. The claim against Denver was dismissed and is not at issue on appeal.

Dodge filed an unsuccessful motion for summary judgment, invoking qualified immunity. According to the district court there were multiple factual disputes regarding Valverde's actions in the seconds before he was shot, and the video footage of the incident could not resolve these disputes because it offered only an aerial perspective. The court determined that Plaintiff had made a prima facie showing of a clearly established constitutional violation because, construing the evidence most favorably to Plaintiff, "Mr. Valverde discarded his firearm and complied, or at least was in the process of complying, with the order to put his hands up before Officer Dodge shot him." *Estate of Valverde ex rel. Padilla v. Dodge*, No. 16-CV-1703-MSK-MEH, 2019 WL 2992027, at *3 (D. Colo. July 9, 2019).

## II. DISCUSSION

### A. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). If a defendant invokes qualified immunity, the plaintiff has the burden to show

9

that (1) the defendant violated a constitutional or statutory right and (2) this right was clearly established at the time of the defendant's challenged conduct. *See id.* at 232.

Dodge's appeal challenges the district court's denial of his motion for summary judgment based on qualified immunity. Plaintiff contends that we lack jurisdiction to hear this appeal. Ordinarily, we lack jurisdiction to review the denial of summary judgment. That is because 28 U.S.C. § 1291 limits appellate jurisdiction to review of final decisions: typically, those "decisions that end the litigation on the merits so that nothing remains for the court to do but to execute the judgment." *Attocknie v. Smith*, 798 F.3d 1252, 1256 (10th Cir. 2015). The usual district-court order denying summary judgment does not satisfy this finality rule, because it "leaves much (often everything) to be decided." *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013) (internal quotation marks omitted). But because the doctrine of qualified immunity provides immunity from suit, not just a defense to liability, an essential component of the protection of the doctrine is lost if summary judgment is improperly denied and the official is subjected to litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985) ("[A district] court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations."). Thus, a district court's denial of a qualified-immunity motion for summary judgment may be immediately appealable. *See Colbruno v. Kessler*, 928 F.3d 1155, 1160 (10th Cir. 2019).

Our jurisdiction on qualified-immunity interlocutory appeals is, however, limited. We have jurisdiction only to the extent that the appeal turns on "abstract legal conclusions." *Fogarty v. Gallegos*, 523 F.3d 1147, 1153 (10th Cir. 2008). "That is, this

court has jurisdiction to review (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013) (internal quotation marks omitted). "[W]e are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty*, 523 F.3d at 1154.

Still, the mere existence of controverted factual issues does not necessarily divest us of jurisdiction. "We need not . . . decline review of a pretrial order denying summary judgment solely because the district court says genuine issues of material fact remain; instead, we lack jurisdiction only if our review would require second-guessing the district court's determinations of evidence sufficiency." *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001). Thus, "our jurisdiction is clear when the defendant does not dispute the facts alleged by the plaintiff and raises only legal challenges to the denial of qualified immunity based on those facts." *Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015) (internal quotation marks omitted); *see Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014) ("[D]eciding legal issues of this sort is a core responsibility of appellate courts . . . ."); *Walton v. Powell*, 821 F.3d 1204, 1209 (10th Cir. 2016) ("[I]f the rule were otherwise and we could not consider the sufficiency of the (given) facts to sustain a lawful verdict, a great many (most?) qualified immunity summary judgment appeals would be foreclosed and [the] promise of assuring a meaningful interlocutory opportunity

11

to vindicate what is supposed to be an immunity from trial would be irretrievably lost." (internal quotation marks omitted)).

Also, when the district court expresses no view on the sufficiency of the evidence regarding an essential element of a claim or defense, we may assume that task. *See Walton*, 821 F.3d at 1208 ("Often enough, a party will argue that the district court failed to identify what facts a jury might reasonably find—an assertion that requires us, first, to decide if the district court did or didn't determine the facts a jury could find and, second, to determine the facts for ourselves if the district court didn't."). The only bar to our review in this regard is that we are required "to accept as true the facts the district court expressly held a reasonable jury could accept." *Id.*

We must note, however, that the appellate court is not always bound by a district court's ruling that the evidence presented would support a particular fact-finding. In *Scott v. Harris,* 550 U.S. 372, 380 (2007), the Supreme Court held that the lower courts should have discredited the plaintiff's version of events because it was "blatantly contradicted" by videotape of the incident. *See Durastanti*, 607 F.3d at 659 ("While a court considering a summary judgment motion based upon qualified immunity usually must adopt the plaintiff's version of the facts, that is not true to the extent that there is clear contrary video evidence of the incident at issue." (brackets and internal quotation marks omitted)).

In sum, we have jurisdiction if the defendant's appeal seeks qualified immunity based on incontrovertible facts, facts that the district court has declared to be supported by the record, and—to the extent that the district court has not expressed its view—the

remaining evidence as seen in the light most favorable to Plaintiff. Under this standard, we believe we have jurisdiction to consider the issues raised by Dodge on appeal.

Plaintiff argues that the requirements for interlocutory review have not been met because Dodge relies on arguments that are "thinly veiled attempts" to challenge the district court's "conclusion that [Plaintiff] presented sufficient evidence to survive summary judgment." Aplee. Br. at 4. But Dodge's arguments on appeal accept as true the district court's rulings regarding what facts are supported by evidence. In particular, Dodge does not dispute that Valverde was discarding the gun and raising his hands before being shot. The thrust of Dodge's argument is that his own actions must be assessed from his perspective of what was happening, and that his actions were reasonable in light of his reasonable beliefs at the time. His argument may or may not be legally valid, but it is within our appellate jurisdiction to consider it. We now turn to that task. Our review is consistent with Plaintiff's version of events, but we supplement that version with clear evidence from the synchronized video that enables us to assess the events from Dodge's perspective.

### B.    The Shooting

We review de novo the denial of a qualified-immunity motion for summary judgment, applying the same standard the district court should apply. *See Rieck v. Jensen*, 651 F.3d 1188, 1191 (10th Cir. 2011).

### 1.    Legal Principles

In an excessive-force case, as in other Fourth Amendment seizure cases, a plaintiff must prove that the officer's actions were "objectively unreasonable." *Estate of Larsen*

13

*ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). To assess objective reasonableness we evaluate whether the "totality of the circumstances" justified the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes. The Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (citations and internal quotation marks omitted); *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The [officer's] belief need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable."). "Courts are particularly deferential to the split-second decisions police must make" in situations involving deadly threats. *Estate of Smart ex rel. by Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020).

In *Graham* the Supreme Court noted three nonexclusive factors for determining whether a particular use of force was excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others,"

and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."

490 U.S. at 396. Each factor must be evaluated from the perspective of the officer on the scene. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011); *see also Thomson*, 584 F.3d at 1319. Although the first and third factors can be particularly significant in a specific case,[1] the second factor—whether there is an immediate threat to safety—"is undoubtedly the most important . . . factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (internal quotation marks omitted). That is particularly true when the issue is whether an officer reasonably believed that he faced a threat of serious physical harm. *See Durastanti*, 607 F.3d at 664 ("[I]f threatened by weapon . . . , an officer may use deadly force."). Regarding the first factor, for example, although Valverde was being arrested for a felony, which is a serious crime,[2] it would be insignificant whether he was to be arrested

---

[1] *See Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (first factor "weigh[ed] heavily against the use of anything more than minimal force" because "the officers were performing a welfare check, and . . . were not looking for [the victim] because they suspected that he had committed a crime prior to finding him"); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 776–77, 781 (10th Cir. 1993) (officers wrestled a suspect to the ground and used a stun gun on him; even though the first two *Graham* factors favored the suspect, the force was justified because the suspect was actively resisting arrest).

[2] *See Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018) (evaluating severity using the felony/misdemeanor distinction is "consistent with the many cases in which we have held that the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor"); *Pauly*, 874 F.3d at 1215 & n.5 (reckless driving and driving while intoxicated were "minor crimes" because they were misdemeanors); *Storey*, 658 F.3d at 1239 (first factor satisfied because vehicle theft is a felony). Plaintiff argues that the first *Graham* factor weighed against the use of significant force because Valverde's offenses were nonviolent. But those offenses—unlawful dealing in guns and large amounts of drugs—are notoriously linked to violence; and in any event, our cases have

for a minor crime or was not even a criminal suspect if it reasonably appeared that he was about to shoot a gun at an officer from close range. (The nature of the crime would, however, be relevant to whether the officer was reasonable in evaluating ambiguous conduct to assess the threat.) Likewise for the third factor, since anyone who appears to be ready to shoot an officer certainly appears to be ready to resist arrest. We therefore can focus our attention on the second factor.

In that regard, our decision in *Larsen* sets forth several considerations that may be useful for assessing the immediacy and degree of the danger facing officers: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260; *see Tenorio*, 802 F.3d at 1163–64 (describing these factors as "aids" in making the ultimate reasonableness determination from the perspective of an officer on the scene). Assuming that the suspect was drawing a gun to fire at an officer only a few feet away, those factors support the officer's use of deadly force. The second, third, and fourth would obviously be satisfied. Drawing the gun to fire at an officer is a hostile motion with hostile intent and presents a lethal threat when the officer is close by. The first factor can certainly be of central importance when the suspect is already holding a weapon when first observed by officers. In *Larsen*, for example, the officer was reasonable in shooting a knife-wielding suspect

---

not considered the nature of a felony in determining that it is a serious offense under the first *Graham* factor.

16

because the suspect refused to comply with repeated orders to drop the weapon. *See* 511 F.3d at 1258, 1263; *see also Thomson,* 584 F.3d at 1319 (shooting the suspect was reasonable in part because suspect had been ordered to "drop his [gun], but he did not comply with the command"). But when the suspect is not holding a gun when the confrontation begins, officers can do little more than what they did in this case: order the suspect to raise his hands and get to the ground. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) (warning need be given only when feasible).

## 2. Application

In light of the above principles, the decisive question is whether Dodge was reasonable in believing that Valverde was going to fire his gun at Dodge or other officers. We conclude that Dodge's belief was reasonable. He had been informed that Valverde was involved in high-violence criminal enterprises—dealing guns and large quantities of drugs. Dodge saw the barrel of a gun as Valverde pulled it from his waistband or pocket. To wait to see what Valverde would do with the weapon could be fatal. Dodge fired immediately. The sound of his first shot was less than a second after Valverde pulled out his gun. The sound of his last shot was a mere second after the first.

The district court denied Dodge's motion for summary judgment based on qualified immunity because it said that the evidence could support a finding that Valverde was not shot until after he had disposed of his gun and was raising his hands in surrender. This ruling, however, overlooked two fundamentals of the necessary analysis. First, the district court failed to consider that allowance needs to be made for the fact that the officer must make a split-second decision. The Constitution permits officers to make

17

reasonable mistakes. Officers cannot be mind readers and must resolve ambiguities immediately. *See Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995) ("Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant."). Perhaps a suspect is just pulling out a weapon to discard it rather than to fire it. But waiting to find out what the suspect planned to do with the weapon could be suicidal.

The district court's second error was that it failed to appreciate that the facts must be viewed from the perspective of the officer. For purposes of this appeal, we accept as true the district court's view that the evidence could support a finding that by the time Dodge fired his gun Valverde had dropped his gun and was raising his hands. But the court expressed no view on what the jury could find regarding what Dodge had observed when he made his decision to fire. Yet that is absolutely critical to resolving the legal issue before us. Therefore, it is left for this court to determine what a reasonable jury could find on that score. *See Walton*, 821 F.3d at 1208 ("Often enough, a party will argue that the district court failed to identify what facts a jury might reasonably find—an assertion that requires us, first, to decide if the district court did or didn't determine the facts a jury could find and, second, to determine the facts for ourselves if the district court didn't."). And, we should add, even if one were to interpret the district court's ruling as, in some way, addressing events from Dodge's perspective, we are not bound by that ruling to the extent that it is blatantly contradicted by the video. *See id.*

Viewing the video, no jury could doubt that Dodge made his decision to fire before he could have realized that Valverde was surrendering (by dropping his gun and

raising his hands).  The concurrence objects to our use of the video on the ground that it was taken from a significant distance and is grainy, so it does not clearly depict Valverde's right hand or his hand movements.  But an HDTV-quality image is not necessary for our purposes.  There is no question that Valverde pulled out a gun.  What then matters (as will be explained in more detail as we review the relevant case law) is when it should have been clear to Dodge that Valverde was no longer a threat because he had disposed of his gun and was raising his arms in surrender (in particular, not raising his arm to fire at the officers).  We have already noted that the video shows that Dodge fired his first shot less than a second after Valverde pulled out his gun.  It is also clear from the video that Valverde did not extend his right arm away from his body (apparently to drop the weapon) until about half a second before the first shot was fired and he did not *begin* to raise his hands toward his head until about a quarter-second before Dodge fired.  The law permitted Dodge to fire as soon as he saw the gun in Valverde's hand.  This is not a case where the officer had sufficient time to appreciate that the suspect was no longer a danger before the officer decided to fire.

This court has repeatedly held that officers in similar circumstances acted constitutionally, even when the actions of the person shot were ambiguous.  In *Wilson*, 52 F.3d at 1549, the officer asked to see the decedent's hands.  When the decedent brought forward a hand holding a gun, the officer fired twice.  *See id.* at 1550.  Acknowledging that "perhaps [the decedent] intended to surrender," *id.* at 1553, we nevertheless held that there was no constitutional violation.  We said that "it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for

19

someone's life—if not his own, then the life of a bystander or the gunman himself." *Id.*

In *Larsen* we said that the law does not require an officer to "await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." 511 F.3d at 1260 (internal quotation marks and ellipsis omitted). In *Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005), when officers knew the suspect in his own house was armed, dangerous, and had threatened them, "[t]here was no reason for [the shooting officer] to have to wait to be shot at or even to see [the suspect] raise a gun and point it at him before it would be reasonable for him, under the[] circumstances [of a SWAT standoff], to shoot [the suspect when the suspect was standing at a window]." And in *Thomson*, 584 F.3d at 1318–19, we held that an officer was justified in shooting an armed, suicidal man less than ten seconds after confronting him, even though the man had his gun pointed toward his own head when shot, because "[i]t would have been virtually impossible for [the officer] to ascertain whether [the man's] gun simply was moving upward or if it was coming down to be aimed at him again," *id.* at 1319; the officer "was forced to make a split-second decision," *id.*

These binding precedents are not in the least inconsistent with the prevailing view in other circuits. In *Valderas v. City of Lubbock*, 937 F.3d 384, 390 (5th Cir. 2019), the officer saw a suspect pull a gun from his waistband as officers approached. The court held that the officer reasonably used deadly force against the suspect, even though the suspect had (unobserved by officers) thrown the gun into a car in the brief moments before being shot. *See id.* at 387, 390. The officer "was not required to wait to confirm that [the suspect] intended to use the gun before shooting"; "[o]ur circuit has repeatedly

20

held that an officer's use of deadly force is reasonable when an officer reasonably believes that a suspect was attempting to use or reach for a weapon." *Id.* at 390. In *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 818–19, 821 (11th Cir. 2010), the court granted qualified immunity to an officer who shot a fleeing robbery suspect who held a gun but, by his version of events, did not point it at officers, because "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect," *id.* at 821 (original brackets and internal quotation marks omitted). In *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996), the court declared: "No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life." As it explained, "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Id.* at 641*; see Ayala v. Wolfe*, 546 F. App'x 197, 200–01 (4th Cir. 2013) (applying *Elliott* when officer shot suspect who pulled gun from waistband); *cf. George v. Morris*, 736 F.3d 829, 835, 838–39 (9th Cir. 2013) (officers not entitled to qualified immunity at summary-judgment stage because of evidence that the suspect, who was carrying gun when officers arrived, always pointed it toward the ground; but the court notes that the Fourth Amendment does not "always require[] officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat," *id.* at 838). *Contra Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1008 (9th Cir. 2017) (officers denied qualified immunity even though suspect was raising

21

apparent AK-47, because the weapon had not been raised enough to be pointed at the officers).

Several decisions illustrate that an officer does not violate the Fourth Amendment even when in retrospect it is clear that the officer made a mistake in shooting someone who did not pose a threat at the precise moment of the shot. In *Mullins v. Cyranek*, 805 F.3d 760, 763–64 (6th Cir. 2015), the officer told the suspect to drop the gun he had brandished in his hand but when the suspect instead threw the gun, the officer shot him twice, shortly after the gun was thrown. The court decided that the officer reasonably feared that he and the public were in danger, even though the suspect may have ceased being a deadly threat in the "sanitized world of our imagination." *Id.* at 767 (internal quotation marks omitted). And Justice Powell, sitting by designation, wrote that an officer was justified in shooting a suspect seated in his car during a buy-bust operation because the suspect did not raise his hands when commanded, had partially closed his hands around a suspected gun, and began to turn toward the officer before being shot; even though the suspected gun was actually a beer bottle, the officer reasonably believed the suspect posed a deadly threat. *See Slattery v. Rizzo*, 939 F.2d 213, 214–17 (4th Cir. 1991); *see also Lamont v. New Jersey*, 637 F.3d 177, 179, 180, 183–84 (3d Cir. 2011) (officers reasonably used deadly force against suspected car thief who was fleeing on foot when the suspect suddenly pulled his right hand out of his waistband as though he was drawing a gun, even though it turned out he was holding only a crack pipe); *cf. Durastani*, 607 F.3d at 666 (officer struck by fleeing driver reasonably fired gun at the driver even though the car had already driven by him; given the disorienting experience

22

of being hit and propelled over the car's hood, the officer could not reasonably determine in this split second that the car threat had passed).

In short, Dodge's decision to shoot Valverde once he observed him draw a gun is exactly the type of split-second judgment, made in "tense, uncertain, and rapidly evolving" circumstances, "that [courts] do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers." *Thomson*, 584 F.3d at 1318 (internal quotation marks omitted).

The above discussion disposes of most of Plaintiff's arguments that Dodge acted unreasonably in using deadly force. We now address the remaining ones.

Plaintiff argues under the third *Larsen* factor that Dodge should have realized he was not in immediate danger because "there was a fair amount of distance between [Valverde and Dodge], including a car in between them that could be used as cover." Aplee. Br. at 24. The argument makes no sense. If Dodge had tried to hide on the other side of the sedan, Valverde could have taken three or four steps around the hood of the car and shot the crouching Dodge at close range. And Dodge's hiding would hardly have protected his comrades from Valverde.

Plaintiff also argues that the opinion of its police-practices expert demonstrates the unreasonableness of Dodge's belief that Valverde posed an imminent danger. Plaintiff's police-practices expert opined in an affidavit that:

> An individual who has his empty hands up near his head, incompliance [sic] with the officer's command to do so, does not pose an immediate threat of death or serious bodily injury and does not pose a threat to the safety of the officers or others. A reasonable officer would not perceive that Mr. Valverde posed an immediate threat to the safety of Dodge or

23

others.

Aplt. App., Vol. II at 454–55. We agree that a reasonable officer would not believe that a suspect with his empty hands near his head poses a threat. But the expert's opinion does not address the situation from Dodge's perspective: that is, that Dodge had to make a split-second decision in reaction to Valverde's drawing a gun. Absent an explanation of why it was unreasonable for Dodge to act immediately upon seeing Valverde pull out a gun, the expert's affidavit is unpersuasive.

Plaintiff also points out that none of the five other SWAT team officers fired a weapon. She contends that their decisions to withhold fire provide circumstantial evidence that a reasonable officer would not have believed Valverde to be an immediate threat of death or serious bodily injury. But the issue is whether a reasonable officer *in Dodge's position* would have believed Valverde was armed and dangerous. Two of the officers were to Valverde's left and did not see the gun in his right hand. The K-9 officer was further back but did not see a gun in Valverde's hand. And the second officer coming from Valverde's right had not yet rounded the SUV and did not see Valverde until after the shooting. Rodriguez did see Valverde with the gun, but Rodriguez was crouching down on the sidewalk and was in no position to fire a weapon. Also, the lead officer coming around the SUV said that when he first saw Valverde, he was pointing his gun at the van. He warned the officer coming behind him; but he heard the shots just as he got the words out. Thus, Dodge was the only officer besides Rodriguez who saw Valverde draw his gun, and Valverde was facing Dodge at the time; the failure of the other officers to fire is of little relevance. *See Larsen*, 511 F.3d at 1263 n.4 (fact that

24

officer's partner did not fire did not support argument that officer's use of deadly force was unreasonable because suspect, armed with a knife, was moving toward officer, not partner).

Plaintiff argues that our decision in *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), supports his position. We disagree. In that opinion we said that the jury could have found that the officers were unreasonable in believing that the victim was carrying a gun. *See id.* at 1159–61. Here, there is no dispute that Valverde had a gun in his hand. Of course, it would have been unreasonable for Dodge to shoot Valverde if (1) Valverde did not have a gun and (2) Dodge was unreasonable in thinking otherwise. But that is not this case.

Plaintiff also claims support in eight out-of-circuit opinions. But not only can they not override precedent from this circuit, they are also readily distinguishable. In *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998), which Plaintiff's counsel at oral argument identified as her best case, the court reversed a summary judgment in favor of officers. Unlike here, no officer said he saw the victim with a gun, and the victim asserted that he stopped and raised his arms as commanded by the officers and made no furtive motions. *See id.* at 415–18. Parentheticals suffice to distinguish six of the other cases. *See Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) (suspect shot by officer "execution style" in the back from about 12–18 inches away when suspect was disarmed, compliant, and face down with his hands behind his back); *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (where officers failed to identify themselves and had created a disturbance at night on victim's property, victim went outside to investigate,

25

carrying shotgun with muzzle pointed to the ground; victim made no threats or sudden moves and ignored no commands); *Hopkins v. Andaya*, 958 F.2d 881, 883, 886–87 (9th Cir. 1992) (officer could not have reasonably feared for his life when he shot victim four times, since victim was unarmed and wounded and officer needed only to forestall victim until arrival of help that was on the way); *Curnow v. Ridgecrest*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (officer not entitled to summary judgment because of evidence that officer shot victim in back when victim was holding girlfriend in his lap at home and had not reached for nearby gun); *Jamison v. Metz*, 541 F. App'x 15, 17, 19 (2d Cir. 2013) (evidence that suspect had stopped fleeing and put hands in air to surrender when shot from behind); *Estate of Bennett v. Murphy*, 120 F. App'x 914, 916, 919 (3d Cir. 2005) (during prolonged armed standoff with distraught man holding gun to his head and up in air, but not at any officers, one officer shot man from behind at a distance of about 80 yards). Plaintiff's final case turns on unusual facts that are far different from ours. In *Brandenburg v. Cureton*, 882 F.2d 211, 212–13 (6th Cir. 1989), officers—who had come to the victim's property to serve a peace warrant requiring him to leave the property—had departed the property after the victim fired warning shots. The victim followed officers to the property gate and put down his rifle while closing the gate. *See id.* at 213. Officers instructed him to comply with the warrant and not pick up his rifle. *See id.* Even after a warning shot from the officers, the victim picked up the rifle and was shot by an officer. *See id.* The court said that a jury could find that the officer did not reasonably feel threatened by the victim. *See id.* at 215. We express no view on the merits of that decision, noting only that it is a far cry from the situation presented here.

26

Finally, Plaintiff asserts that "[a] reasonable officer would have had time to see there was no gun in [Valverde's] hand and that he was not a threat at the time he was shot, including a shot to the back." Aplee. Br. at 19. He relies on this court's statement that "circumstances may change *within seconds* eliminating the justification for deadly force." *Durastani*, 607 F.3d at 666 (emphasis added). But here Dodge began firing *less than a second* after Valverde drew his gun and Dodge stopped firing *within a second* of when he started. And his use of his weapon was not an exercise in sharpshooting in controlled circumstances. He could not be sure that his shots would disable Valverde. Indeed, two of the five shots completely missed their target. In the circumstances, it was hardly unreasonable for Dodge to wait a second (literally) after first firing his gun before reassessing the situation.

## C.      Recklessness Before the Shooting

Plaintiff contends that even if Dodge was entitled to use deadly force based on the situation at the time of the shooting, he still violated the Fourth Amendment because his reckless conduct during the operation unreasonably precipitated his need to use deadly force. She argues that three of Dodge's pre-shooting actions were reckless: (1) his decision to disregard the tactical plan, which had assigned him the less lethal 40-millimeter gun (rather than the carbine he used) and had him providing backup support (rather than deploying out of the van directly toward Valverde); (2) his failure to identify himself as law enforcement, an error magnified by the fact that the officers drove up in an unmarked

27

van, were wearing green uniforms, and used a flash-bang device that likely confused

Valverde; and (3) his failure to provide verbal warnings or commands before shooting.

To resolve Plaintiff's first issue, we relied on the first prong of qualified immunity,

holding that Dodge did not violate Valverde's Fourth Amendment rights when he decided

to shoot. On this issue we rely on the second prong of qualified immunity, the absence of

clearly established law to support Plaintiff's claim. See *Pearson*, 555 U.S. at 236 (Courts

may "exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first.").

Plaintiff's general proposition is a correct statement of the law of this circuit.

"Our precedent recognizes that the reasonableness of the use of force depends not only on

whether the officers were in danger at the precise moment that they used force, but also

on whether the officers' own reckless or deliberate conduct during the seizure

unreasonably created the need to use such force." *Pauly*, 874 F.3d at 1219 (brackets and

internal quotation marks omitted); *Cox v. Wilson*, 959 F.3d 1249, 1255–56 (10th Cir.

2020) (following *Pauly* but noting that it is unclear from recent Supreme Court authority

where the Court stands on the matter).

Nevertheless, Dodge is entitled to qualified immunity with respect to this theory of

liability. It is unnecessary for us to consider whether his conduct was in fact reckless

because Plaintiff has not shown that Dodge violated clearly established law. In this

circuit, to satisfy the burden of showing that the officer's conduct violated clearly

established law, "the plaintiff must point to a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must have found

28

the law to be as the plaintiff maintains." *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). The clarity of the law must be viewed "in light of the specific context of the case, not as a broad general proposition." *Pauly*, 874 F.3d at 1222 (internal quotation marks omitted).

Plaintiff cites two published opinions as clearly establishing that Dodge was reckless. We are not persuaded. The two cases are *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). Both have a similarity to this case. In each, what we held to be reckless was a police onslaught at the victim. In *Allen* there was evidence that officers ran up to the victim's car—with one officer apparently screaming while running up and shouting at him to get out of his car—and tried to wrench the gun from his hands and open the passenger door. *See* 119 F.3d at 839, 841. In *Estate of Ceballos* there was evidence that the officers quickly approached the victim, screamed at him to drop the bat he was holding, and refused to give ground as the victim walked toward them. *See* 919 F.3d at 1209–11, 1215–16. But in both those cases the officers were dealing with an impaired, emotionally distraught person. In that circumstance officers may be asking for trouble by heightening tensions and fear. The calculus is very different when seeking to apprehend someone believed to be involved in high-violence crimes. The SWAT team was called in to make the arrest specifically because it could act with great speed and overwhelming force. Perhaps that is a poor strategy. This court is hardly qualified to determine whether this approach is, as testified to

by the SWAT team members, designed to reduce violence.  What we can say, however, is that the officers were not on notice that such tactics are unconstitutional.  Simply put, we are aware of no case that would have advised Dodge that what he was doing would violate Valverde's Fourth Amendment rights.

### III.    CONCLUSION

We **REVERSE** the district court's denial of summary judgment in favor of Defendant Dodge.

19-1255, *Valverde v. Dodge*
**MATHESON**, Circuit Judge, concurring:

I concur in reversing the district court's grant of summary judgment. But I would not decide whether Sergeant Dodge was entitled to qualified immunity based on prong one—that his conduct violated the Constitution. I have concerns about our interlocutory jurisdiction to review his arguments on that issue. I would reverse instead based on prong two—whether the Estate has shown that Sergeant Dodge's shooting of Mr. Valverde violated clearly established law.

1. **Prong One - Constitutional Violation and Jurisdiction Concern**

On appeal of a denial of qualified immunity, we lack interlocutory jurisdiction to review a "district court's conclusions as to what facts the plaintiffs may be able to prove at trial." *Sawyers v. Norton*, 962 F.3d 1270, 1275 (10th Cir. 2020) (quotations omitted).[1] The only relevant exception here is when "the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record." *Id.* at 1281 n.10 (quotations omitted); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining a court should not adopt a fact that "is blatantly contradicted by the record, so that no reasonable jury could believe it" when ruling on a summary judgment motion).

---

[1] "The denial of qualified immunity to a public official . . . is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law." *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013); *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "[I]f a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).

If Sergeant Dodge would accept the district court's factual findings, we would have jurisdiction to review legal questions about prong one of qualified immunity. *See Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015); *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).[2] But he falls short of doing so. He "concedes the most favorable view of the facts to Plaintiff *to the extent such facts find support in the record*." Aplt. Br. at 6 (emphasis added). At oral argument, his counsel clarified that "any of those facts that are not blatantly contradicted by the video we are not disputing for purposes of this appeal." Oral Arg. at 5:48-57. She was referring to the FBI aircraft video of the six-second incident.

After careful study, I do not think the video blatantly contradicts the district court's determination that a reasonable jury could credit the Estate's version of events. Shot from more than 5,000 feet, the video's pixelated, blurry images do not clearly depict Mr. Valverde's hand movements. Further, the angle of the video shows Mr. Valverde's back and left side. It does not clearly show his right hand, which allegedly grabbed and dropped the gun. And it does not show his front side as viewed by Sergeant Dodge.

---

[2] The district court found "multiple factual disputes" as to whether Sergeant Dodge used excessive force, including whether Mr. Valverde had complied with the order to put up his hands, backed away from Sergeant Dodge, and discarded his firearm before the shooting. *See Estate of Valverde ex rel. Padilla v. Dodge*, No. 16-CV-1703-MSK-MEH, 2019 WL 2992027, at *3 (D. Colo. July 9, 2019). Accepting the Estate's version of the disputed facts, it concluded that "[i]f a jury were to find these facts to be true, they would be sufficient to show that the force used by Officer Dodge was excessive." *Id.*

2

At summary judgment, the Estate contended Mr. Valverde had discarded the gun, put up his visibly empty hands, and was descending to the ground within 2.5 seconds of the encounter. App. at 319, 594 (citing video at 00:50-2:30). Sergeant Dodge countered that Mr. Valverde took at least 5 seconds to back away and successfully pull the gun from his waistband. *Id.* at 135-36 (citing video at 00:16-03:19 and 05:16-29). The video is not as clear to me as it is to the majority. And it does not render the Estate's factual version a "visible fiction." *Scott*, 550 U.S. at 381.[3]

The majority states we can review whether the district court failed to (1) account for Sergeant Dodge's split-second decision and (2) view the facts from the officer's perspective. *See* Maj. Op. at 17-18. It is not evident the court made these errors. The court did not specify that the incident spanned six seconds or state each fact from Sergeant Dodge's point of view. But it cited to and described the events depicted on the video, indicating the court could not have failed to notice the short time frame. *See, e.g.*, *Estate of Valverde*, 2019 WL 2992027, at *3 (describing the video and its aerial perspective). And it "examine[d] the apparent need for the use of force based on the circumstances *as they appeared to officers on the scene*." *Id.* (emphasis added).[4]

---

[3] The summary judgment record includes depositions from the SWAT team officers that also fail to resolve the factual disputes. *See* Dist. Ct. Docs. 91, 98. For example, Sergeant Dodge said Mr. Valverde pointed the gun at him. App. at 212. But at least one other officer testified that Mr. Valverde did not point his gun at any officer and did not have a gun in his hand when he was shot. *Id.* at 478-79.

[4] In addition, the district court properly viewed the facts in the light most favorable to the Estate. *Estate of Valverde*, 2019 WL 2992027, at *3. It found the aerial video

3

Because the majority's legal error points are at least debatable, and Sergeant

Dodge's factual arguments jurisdictionally suspect, I would move to the more

straightforward analysis under prong two.  *See Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 95 (1998) (explaining every federal appellate court must "satisfy itself" of

its own jurisdiction (quotations omitted)).

## 2. **Prong Two - Clearly Established Law**

Whether the district court properly denied qualified immunity to Sergeant Dodge

turns on whether the Estate has shown that his challenged conduct violated clearly

established law.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).[5]  Clearly

established law requires "a Supreme Court or Tenth Circuit decision on point, or the

clearly established weight of authority from other courts."  *Estate of Booker v. Gomez*,

745 F.3d 405, 427 (10th Cir. 2014) (quotations omitted).  Precedent on excessive force

---

supported "varying interpretations" and "[did] not resolve the factual dispute between the
parties."  *Id.*  It found the Estate had presented "evidence that Mr. Valverde discarded his
firearm and complied, or at least was in the process of complying, with the order to put
his hands up before Officer Dodge shot him" which, if a jury found to be true, "would be
sufficient to show that the force used by Officer Dodge was excessive."  *Id.*  And it
correctly stated the relevant legal standards for reviewing a § 1983 excessive force claim,
including the factors from *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Estate of
Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  *See id.*

[5] Even if we lack interlocutory jurisdiction to review prong one of qualified
immunity, whether there was clearly established law "at the time an alleged violation
occurred is a quintessential example of a purely legal determination fit for interlocutory
review" and "presents no jurisdictional difficulties."  *Fancher*, 723 F.3d at 1200
(quotations omitted); *see Sawyers*, 962 F.3d at 1286 ("We have appellate jurisdiction to
consider the abstract issue of whether the law was clearly established.").

must "squarely govern[] the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotations omitted).

To meet its burden, the Estate offers *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006); *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997); and *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014). Aplee. Br. at 37, 42-46.[6] It contends that although these cases "are not factually identical to this case," they show that shooting an individual who is "effectively subdued" violates the Fourth Amendment. *Id.* at 46.[7] It also points to the out-of-circuit authority cited in the district court's order. {*Id.* at 36-38, 46-53.}

The Estate's cases, however, do not "place[] the . . . constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations omitted). It has "failed to identify a case where an officer acting under similar circumstances" violated the Fourth Amendment. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). It inadequately heeds the Supreme Court's instruction that clearly established law must "not be defined at a high level of generality." *Id.* (quotations omitted).

---

[6] The majority cites *Walker* to explain why Sergeant Dodge's shooting was not excessive force under prong one and *Allen* to show that Sergeant Dodge did not recklessly create his need to use deadly force as a matter of clearly established law under prong two.

[7] The district court stated the Estate's version of the facts: "Mr. Valverde complied with the order to put his hands up, did not back away from Officer Dodge, and had already discarded his firearm before Officer Dodge fired the shots." *Estate of Valverde*, 2019 WL 2992027, at *3.

5

In *Walker*, a family called the police to find their suicidal son. 451 F.3d at 1156-57. After a nighttime car chase, police cornered the son in the family's driveway. *Id.* at 1157. The son exited his vehicle, drew a small knife from his pocket, and held it to his wrist. *Id.* at 1158. The family, observing from the driveway, shouted to the officers that he was unarmed. *Id.* The officers did not tell the son to stop or drop the knife, and the son did not advance toward the officers. *Id.* Believing the son had aimed a gun at him, one officer pulled his weapon and shot him in the right hip. *Id.* The son then staggered toward a second officer, who shot him twice in the chest. *Id.* at 1158-59.

The son's family sued the officers under § 1983, contending the fatal shooting constituted excessive force. *Id.* at 1143, 1145. The district court denied the officers' summary judgment motion based on qualified immunity because, viewing the evidence in the light most favorable to the plaintiff, their conduct violated clearly established law. *Id.* at 1154-55. We affirmed. *Id.* at 1161.[8] Although it was nighttime, outdoor lights and car lights brightly lit the driveway. *Id.* at 1157. Given the brightly lit scene and the angle of the son's hands, we said the officers should have ascertained he was not holding a gun. *Id.* at 1160. The young man did not charge the officers or make "slicing or stabbing motions toward" them. *Id.* Further, the officers had no reason to believe he was a threat.

---

[8] The district court determined there was a genuine issue of fact as to what happened during the encounter, and we found we lacked jurisdiction to review the district court's determination. *Walker*, 451 F.3d at 1154-55.

6

The police radio informed them that he "was suicidal, not homicidal." *Id.* at 1159.

Onlookers had yelled that he was unarmed. *Id.* at 1160.

*Walker* held, under its facts, that officers can violate the Fourth Amendment by using force based on an unreasonable belief that a suspect poses a deadly threat. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1165-66 (10th Cir. 2015). But the *Walker* facts differ materially from here. In *Walker*, the brightly lit scene, the police radio information, and the family's telling police the son was unarmed contradicted any reasonable belief the plaintiff was about to shoot. By contrast, Sergeant Dodge's only pre-existing information was that Mr. Valverde had purchased drugs in the past and was potentially armed. App. at 206. *Walker* is too factually dissimilar to put a reasonable officer in Sergeant Dodge's position on notice that his conduct violated the Fourth Amendment. It does not "squarely govern[] the specific facts" here. *Kisela*, 138 S. Ct. at 1153 (quotations omitted).

In *Allen*, police were told an armed, potentially suicidal suspect had threatened family members and left his sister's home. 119 F.3d at 839. When officers arrived at the home, the suspect, Mr. Allen, sat in his car with a gun in his right hand. *Id.* Despite the officers' repeated orders to drop the gun and attempts to seize it, Mr. Allen pointed it at one officer and swung it toward two others. *Id.* The officers fired into the vehicle, striking and killing Mr. Allen. *Id.*

Mr. Allen's family brought a § 1983 excessive force claim against the officers. *Id.* The district court granted summary judgment to the officers based on qualified immunity. *Id.* We reversed, finding a triable issue as to whether they had run to Mr. Allen's car and

7

screamed at him to get out, or had approached cautiously and tried to talk him into giving up the gun. *Id.* at 840-41, 845. We found a reasonable jury could conclude "that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841.

*Allen* would not have made it "clear to a reasonable officer that his conduct was unlawful in the situation [Sergeant Dodge] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quotations omitted). Unlike the officers in *Allen*, Sergeant Dodge had only seconds to react to a suspect who had pulled out a gun. *Allen* did not consider a factually similar scenario with rapidly evolving circumstances. Instead, it addressed when an officer violates the Fourth Amendment by recklessly creating the need to use deadly force.[9]

In *Estate of Booker*, detention center officers restrained an uncooperative detainee who had swung his elbow toward an officer. 745 F.3d at 412-13. The officers "took [the detainee] to the ground, where he lay in the 'prone' position on his stomach." *Id.* at 413. One placed the detainee in a carotid restraint, two others handcuffed him and applied pressure, and another tased him. *Id.* at 413-14. Shortly thereafter, the detainee died. *Id.* at 409. His estate brought a § 1983 excessive force claim. *Id.* We held the officers had used excessive force because the detainee "was handcuffed, prone on his stomach, and not resisting." *Id.* at 429. We found that clearly established law "preclud[ed] the use of

---

[9] I agree with the majority's prong two determination that Sergeant Dodge's alleged reckless and/or deliberate conduct did not, as a matter of clearly established law, unreasonably create the need to use deadly force. *See* Maj. Op. at 27-30.

violent physical force against a . . . detainee who already has been subdued and does not present a danger to himself or others." *Id.* at 428 (quotations omitted)

Again, *Estate of Booker* is factually distinguishable. Unlike the detainee there, Mr. Valverde was not physically restrained when force was used. Nor did the circumstances in *Estate of Booker* evolve as rapidly in a comparably compressed time span.

Finally, the Estate's argument that the district court correctly relied upon the clear weight of out-of-circuit authority is also unconvincing. Aplee. Br. at 36-38, 46-53. Although the majority analyzes these cases under prong one, I agree that they are "readily distinguishable." *See* Maj. Op. at 25.

I therefore conclude the Estate has not met its burden to show clearly established law.

\* \* \* \*

Although we may lack interlocutory jurisdiction to review the district court's factual findings, the Estate has failed to show clearly established law. It thus has not carried its burden to overcome Sergeant Dodge's summary judgment defense of qualified immunity. I concur in the reversal of the district court's denial of summary judgment.

9