**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ELSA KARINA PALACIOS, as the
personal representative of the Estate of
Bernardo Palacios Carbajal,

     Plaintiff - Appellant,

v.

OFFICER KEVIN FORTUNA, in an
individual and official capacity; OFFICER
NEIL IVERSEN, in an individual and
official capacity; SALT LAKE CITY
CORPORATION,

     Defendants - Appellees,

and

SALT LAKE CITY POLICE
DEPARTMENT; CHIEF MIKE BROWN,
in an official capacity as police chief of the
Salt Lake City Police Department,

     Defendants.

No. 22-4025

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:20-CV-00714-DBB)**
_____

Caroline Anais Olsen, (Dick J. Baldwin of Zimmerman Booher, with her on the briefs),
Salt Lake City, Utah, for Plaintiff - Appellant.

Samantha J. Slark of Salt Lake City Corporation, Salt Lake City, Utah, for Defendants -
Appellees.

_____

Before **McHUGH**, **KELLY**, and **EID**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Plaintiff-Appellant Elsa Karina Palacios, personal representative of the estate of the deceased, Bernardo Palacios Carbajal, brought this action under 42 U.S.C. § 1983 against Defendants-Appellees Salt Lake City Police Officers Neil Iversen and Kevin Fortuna in their individual capacities, as well as Salt Lake City Corporation.[1] She alleged that the officers violated Mr. Palacios' Fourth Amendment right to be free of excessive force when he was fatally shot during a police pursuit. The district court granted summary judgment on the basis of qualified immunity in favor of Defendants, finding a lack of a constitutional violation and that Plaintiff failed to show a violation of clearly established law. Palacios v. Salt Lake City Police Dep't, No. 20-cv-00714, 2022 WL 605005 (D. Utah Mar. 1, 2022).[2] Because there was no constitutional violation, the district court dismissed the claims against the city and also dismissed state constitutional claims.

On appeal, Plaintiff contends that disputes about material and historical facts preclude summary judgment. Plaintiff argues that (1) the officers' initial use of force

---

[1] Several other defendants were previously dismissed. 4 Joint App. 19. These three defendants remain on appeal.

[2] Before the district court, Plaintiff also brought a claim under the Utah Constitution. Plaintiff does not challenge the district court's dismissal of that claim on appeal.

was unreasonable under the totality of the circumstances and (2) circumstances changed after Mr. Palacios fell onto his side during the shooting such that it was unreasonable to continue to fire. According to Plaintiff, the district court erred by not making reasonable factual inferences in Plaintiff's favor, primarily that: (1) Mr. Palacios may have been unaware he was being pursued by police because officers did not verbally identify themselves, he was severely intoxicated, and he did not match the full description of the robbery suspect; (2) once Mr. Palacios fell onto his side during the shooting and did not point his gun at officers, he was effectively subdued; and (3) Mr. Palacios' conduct shows he was attempting to avoid confrontation, not evade arrest. Plaintiff also contends that officers exaggerated the seriousness of the offenses that precipitated the pursuit and that officers should have used less intrusive means of apprehension because Mr. Palacios did not pose an imminent threat. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**Background**

This case concerns the tragic death of Mr. Palacios in Salt Lake City, Utah, on May 23, 2020. The following facts are taken from the body cameras of four responding officers, a surveillance camera of the storage facility overlooking the area where two officers ultimately shot and killed Mr. Palacios, audio from police radio dispatch, and officer declarations and depositions. We recount the facts as shown by the video evidence, while making reasonable inferences in favor of the nonmovant where there is a genuine dispute. See Scott v. Harris, 550 U.S. 372, 380–81 (2007).

3

In the early morning hours (2:06 am) on May 23, 2020, a man called 911 and reported that a man just threatened him with a gun and told him to shut up at the Utah Village Motel when he was in Room 3.  The Utah Village Motel is next to the Trails Gentleman's Club, which had just closed for the night.  2 Joint App. 96.  Dispatch broadcast a priority one call, the most serious grading possible on the multi-level scale,[3] indicating the suspect fled in an unknown direction and gave the description of the suspect that the caller had provided: Hispanic male, five feet seven inches tall, in his 30s, wearing all black.  Specific officers were dispatched, but because the call was priority one, other officers in the area were expected to respond if they were available.  2 Joint App. 96.

Officers Iversen and Kilgore were dispatched and arrived within minutes at the Utah Village Motel.  2 Joint App. 96.  Officer Iversen arrived first and waited for Officer Kilgore in his patrol car.  2 Joint App. 96–97.  As he arrived, Officer Iversen noted that there were pedestrians in the general area.  2 Joint App. 134–35.  Before Officer Iversen exited the vehicle, he learned of a second incident at the motel: a woman, in Room 15, said two men with a gun entered her room and threatened her.  2 Joint App. 96–97.  Officer Iversen asked for a description of the suspect.  2 Joint

---

[3] The Salt Lake City police policy manual currently defines a priority one call as the following: "These are calls requiring immediate attention.  They include in-progress crimes, major crimes just occurred with a time lapse of five minutes or less for property crimes and fifteen minutes or less for crimes against a person, and non-criminal situations of an emergency nature."  Salt Lake City Police Dep't, Salt Lake City Police Pol'y Manual 537 (Oct. 25, 2022), https://www.slcpd.com/ass3ts/uploads/2023/01/RELEASE_20221025_T142134_Salt _Lake_City_Police_Department_Policy_Manual.pdf.

App. 96–97.  Dispatch stated the description was "definitely Hispanic, but very light skinned," but that the second caller disconnected before providing further description.  Dispatch then added that the first caller in Room 3 reported that the suspect had short, dark hair and repeated the description from the first caller.  The second call was also broadcast as high priority, and dispatch advised that "all units respond."

Officers Iversen and Kilgore began walking around Utah Village Motel.  Both officers saw a man (Mr. Palacios) outside Room 15 of the motel.  At the time, Mr. Palacios, a Hispanic male, was wearing jeans, a black shirt, a gray-black jacket, and a red bandana.  3 Joint App. 90.  The officers shone a flashlight on Mr. Palacios from some distance away and each shouted "Show us your hands!" one time.  Mr. Palacios fled from the officers around the corner of the motel and down an alley.  Officer Iversen began pursuit and shouted "Show me your hands!" two more times.  Throughout the chase, Mr. Palacios ran past several blind corners.

Another officer, Sergeant Schneider arrived at the motel in response to dispatch as Officer Iversen began his foot pursuit.  Sergeant Schneider shouted "Drop it!" three times as Mr. Palacios and Officer Iversen ran by, and he joined the foot pursuit.  Sergeant Schneider was some distance behind Officer Iversen, about five or six seconds behind him at the start of the chase.  During the start of the pursuit, Sergeant Schneider radioed that Mr. Palacios had something in his pocket, and thereafter that Mr. Palacios had a gun and had reached into his waistband.  He later testified that he was "fairly certain" Mr. Palacios had a gun.  He did not know if Mr.

5

Palacios maintained possession of the gun after he rounded the corner.  2 Joint App. 169–70.

When Mr. Palacios ran out from the alley and across the street, he fell to the ground.  While running across the street behind Mr. Palacios, Officer Iversen yelled "Drop it!" four times and "Show me your hands!" three times before stopping, remaining in the street.  He appears to be a few yards away from Mr. Palacios.  Mr. Palacios got up with an object in his hand and took a few steps away from Officer Iversen, then fell again.  He reached out to pick up an object — and it is unclear from the videos what it is — as he got up again.  He took a few more steps and fell a third time off the curb into the parking lot of Granary Storage.

Officer Iversen also moved closer, now onto the sidewalk outside Granary Storage.  Officer Iversen would later testify that he was 99% sure that the object was a gun, based on the sound it made when Mr. Palacios dropped it and because he was responding to a suspect who threatened several people with a gun.  2 Joint App. 131–32, 133.  When Mr. Palacios fell the third time, Officer Iversen could clearly see that he had a gun.  Id. at 133.

Officer Fortuna was in the area and heard the dispatch reports of multiple threats with a gun, and that Officer Iversen was engaged in foot pursuit.  Right before Mr. Palacios fell the third time, Officer Fortuna arrived at the scene with sirens and lights on.  He shouted "Drop it!" five times as he joined Officer Iversen, now both on the sidewalk outside Granary Storage.  By this time, Mr. Palacios had been told to drop it or show his hands at least eighteen times by four different officers.

6

As Mr. Palacios got up a third time, he reached again for the object, fumbled it, and then picked it up as he continued to flee. It is visibly a gun, and Officers Iversen and Fortuna each testified that they clearly saw the gun. 2 Joint App. 133, 210. Officers Iversen and Fortuna were on the sidewalk outside of Granary Storage with guns raised at Mr. Palacios. They appear to be about 15 feet away from him. See 2 Joint App. 137, 214. Sergeant Schneider was in the street behind Officer Iversen and approaching the other two officers. Approaching the scene next to Officer Fortuna's parked car, Sergeant Schneider yelled "Tase him! Tase him! Tase him!" Sergeant Schneider later testified that he could not see what the officers saw (because he was at least 10 yards behind them), and yelled "Tase him!" because Mr. Palacios may have been separated from the gun while running. 2 Joint App. 171.

After Mr. Palacios picked up the object on the ground and took two or three steps away from the officers, bringing the gun he just picked up to the front of him with his right arm, Officers Iversen and Fortuna opened fire. They fired continuously for about eight to ten seconds, and the last shot came one second after the rest. Officer Fortuna appeared to fire first, and Officer Iversen fired at nearly the same time. 2 Joint App. 134, 211. When shots were fired, Mr. Palacios had his back to the officers. Sergeant Schneider caught up with the other officers as they began to fire.

After several shots, Mr. Palacios fell to the ground and landed on his right side. What happened next is the subject of dispute. Officer Iversen's and Fortuna's body cameras, which are closer to their perspective, recorded video clearly showing Mr. Palacios continuing to move his legs as he rolled onto his back. As he rolled, his

7

arms were also moving and he brought his hands near his waistband.  During this time, Sergeant Schneider yelled "Alright! Alright! Alright!"  Sergeant Schneider drew his gun, but did not fire, and was moving to the right of Officers Iversen and Fortuna around Mr. Palacios.

The parties disagree as to what Mr. Palacios was doing with his hands after he fell to the ground.  Plaintiff speculates he was attempting to surrender or cover a wound.  Aplt. Br. at 38, 41, 44–45.  Defendants contend that the videos show Mr. Palacios pointing the gun in a ready position at Officers Iversen and Fortuna as he rolled onto his back.  Aplee. Br. at 14–15, 36–37, 40 (citing both officers' body camera videos and the surveillance footage from Granary Storage); 2 Joint App. 138–39; see also id. 216.

What is clear from the videos, is that prior to any shots being fired Mr. Palacios fell and picked up his gun in his right hand.  After officers began shooting and Mr. Palacios fell onto his right side, he immediately began moving his legs and bringing his arms and hands to the front of his body as he rolled over.  Although Plaintiff contends that there was a pause or time to stop shooting, the video evidence is directly contrary: Mr. Palacios is not immobile after he falls to the ground and just prior, he picked up his gun for the third time.

Plaintiff asserts that Mr. Palacios did not point his gun directly at the officers and was not making a threatening motion.  The district court rejected Plaintiff's contention that Mr. Palacios rolled over and was using his hands to protect himself or surrender, finding that "the videos taken together . . . confirm that Mr. Palacios had a

gun in his hand, pointed toward the officers . . . ." 4 Joint App. 42–43. We do not think that either characterization is definitively supported by the video evidence. It simply is unclear exactly what motion Mr. Palacios made. But even if Mr. Palacios was not pointing his gun directly at the officers (and even assuming he intended to surrender or cover a wound), such a dispute is not material. We have held that a mistaken belief does not defeat qualified immunity so long as it is reasonable. Thomas v. Durastanti, 607 F.3d 655, 666 (10th Cir. 2010).

Officers Iversen and Fortuna together fired over 30 rounds. At that point, the officers stopped shooting and resumed shouts of "Show us your hands!" and "Drop it!" Mr. Palacios did not appear to be moving. Several other officers arrived on the scene, for a total of six officers. Sergeant Schneider radioed in for medical help, informing that the suspect was down. Officer Southworth is one of the officers who arrived later and he approached Mr. Palacios on the ground first. From Officer Southworth's body camera, a gun is clearly visible on Mr. Palacios' left hip, outside of his pants, as he lay on his back. Officer Southworth kicked the gun away, and another officer kicked it further.[4] Mr. Palacios was pronounced dead at the scene. 3

---

[4] About five minutes after the shooting ended, dispatch reported that a third caller had been robbed in the area by two men who put a gun to his head. This victim's wallet was recovered from Mr. Palacios. 2 Joint App. 30. We note that although this robbery happened before the other two incidents, the victim was unable to call 911 to report the crime until he found someone willing to let him use their phone. 2 Joint App. 29. Thus, this information was unavailable to Officer Iversen prior to beginning his pursuit and unavailable to Officer Fortuna prior to arriving at the scene. See 2 Joint App. 38–40. We therefore do not consider this third incident or the recovery of the wallet from Mr. Palacios as part of the reasonableness analysis

Joint App. 88.

## Discussion

We review the district court's grant of summary judgment de novo. Lance v. Morris, 985 F.3d 787, 793 (10th Cir. 2021). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law . . . ." Est. of Beauford v. Mesa Cnty., 35 F.4th 1248, 1261 (10th Cir. 2022). On summary judgment, we "construe the facts in the light most favorable to the nonmovant and . . . draw all reasonable inferences in its favor." Id. In qualified immunity cases, this generally means adopting the plaintiff's version of the facts; however, "[w]e do not have to accept versions of the facts contradicted by objective evidence, such as video surveillance footage." Id. at 1261, 1267.

Officers are entitled to qualified immunity unless they "(1) violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff bears the burden on both questions. Est. of Beauford, 35 F.4th at 1261. We may address the two qualified immunity questions in either order. Pearson v. Callahan, 555 U.S. 223,

leading to either officer's decision to use deadly force. See Est. of Taylor v. Salt Lake City, 16 F.4th 744, 748 n.1 (10th Cir. 2021).

236 (2009).

## A. Constitutional Violation

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Reavis Est. of Coale v. Frost, 967 F.3d 978, 985 (10th Cir. 2020) (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985)). Here, deadly force was used to apprehend Mr. Palacios. Therefore, the inquiry is: "[W]hether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "Courts are particularly deferential to the split-second decisions police must make in determining precisely when a deadly threat has passed." Est. of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1177 (10th Cir. 2020). Even a mistaken view of the facts does not preclude a finding that an officer acted reasonably. Thomas, 607 F.3d at 666.

To determine whether an officer acted reasonably, we consider the totality of the circumstances. Est. of Valverde by and through Padilla v. Dodge, 967 F.3d 1049, 1060 (10th Cir. 2020). In Graham v. Connor, the Supreme Court outlined three factors to consider: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The second factor is generally the most important to determine whether an officer acted reasonably.

11

Valverde, 967 F.3d at 1060–61.  The Graham factors are nonexclusive and not dispositive; the inquiry remains focused on the totality of the circumstances.  Id.

### 1.  Factor 1: Severity of the Crime at Issue

When the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the plaintiff.  Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021).  Here, dispatch classified the call as priority one, the most serious level possible on the multi-level scale.  The first caller, from Room 3 at the motel, described one male who threatened him with a gun as an adult, Hispanic male about five foot seven, in his 30s, wearing all black.  The second caller, from Room 15 at the motel, reported that two men entered her room with a gun, describing one of them as Hispanic and lighter-skinned, but disconnected before describing the second man.  When Officer Iversen shone his flashlight at Mr. Palacios, Mr. Palacios was outside of Room 15.  This was minutes after the threat in Room 15 was reported.  Officer Fortuna also understood he was responding to reports of multiple threats that involved a gun.

Plaintiff does not challenge these facts, but in reply argues that officers exaggerated the seriousness of the crimes at issue.  Aplt. Reply Br. at 4–5.  Under Utah law, burglary and aggravated burglary are felony offenses and include entering or remaining unlawfully in a building with intent to commit theft, an assault, or other felony.  Utah Code § 76-6-202 to 203.  Aggravated burglary is doing so with a

dangerous weapon, including a gun.  Id. § 76-6-203; id. § 76-1-101.5(7).[5]  Even considering only the second caller's description of events, the crime at issue is potentially a serious, violent felony involving direct threats to others.  Mr. Palacios was seen by Officer Iversen outside of Room 15, where the second call had come from, and he fit at least some of the general description of one of the men and no description was given of the other.  The first call was also termed priority one, the most serious level possible.  Officers Iversen and Kilgore directed him to show his hands, and he turned and fled.  Thus, this factor weighs in favor of Defendants.

### 2.  Factor 3: Actively Resisting or Attempting to Evade Arrest

Turning to the third Graham factor, Mr. Palacios fled after being told to show his hands.  Plaintiff argues that Mr. Palacios did not know that he was being pursued, at least initially, by police because they did not verbally identify themselves and that a jury could conclude that officers were at least partly responsible for his flight.  Aplt. Br. at 28, 32.  An officer's merely negligent conduct is not actionable under § 1983, the officer must have acted recklessly or deliberately.  Sevier v. City of Lawrence, 60 F.3d 695, 699 & n.7 (10th Cir. 1995).  A suspect's subjective knowledge of whether he is encountering police is not relevant to the inquiry, but rather the question is whether "an objectively reasonabl[e] officer could conclude, based on the facts and circumstances surrounding the situation," that the suspect knew that he was being pursued by the police.  Emmett v. Armstrong, 973 F.3d 1127, 1133 (10th Cir. 2020).

---

[5] Utah law also defines robbery and aggravated robbery as felonies, which may also apply.  Utah Code § 76-6-301 to 302.

13

Here, though neither officer verbally identified themselves as police officers, they were in police uniforms when Officer Iversen shone a flashlight on Mr. Palacios. He and Officer Kilgore both shouted "Show me your hands!" It is unclear if either officer's marked patrol car was visible to Mr. Palacios. Then, Mr. Palacios fled while Officer Iversen pursued him. Sergeant Schneider arrived, got out of his car, and also shouted "Drop it!" As Mr. Palacios continued down the alley and out across the street, Officer Iversen again gave commands to "Drop it!" Officer Fortuna arrived with lights and sirens on in a marked patrol car. As Mr. Palacios fell for the third time, Officer Fortuna exited his car and also yelled "Drop it!" five times, yet Mr. Palacios picked his gun back up. Before either officer fired, Mr. Palacios had been told to drop it or show his hands repeatedly, consistent with law enforcement instruction. An objectively reasonable officer under the circumstances would believe Mr. Palacios knew he was being pursued by the police. Officers Iversen and Fortuna did not act recklessly by not verbally identifying themselves.

Plaintiff makes two additional arguments: that a reasonable officer (1) would have realized Mr. Palacios did not match the description of the robber and thus would not have anticipated that officers would be looking for him, Aplt. Reply Br. at 17; and (2) would have taken Mr. Palacios' intoxication and "obvious panic" into account to realize he did not know police were chasing him. Id. Mr. Palacios was not an exact match to either description that had been reported, but a full description was not given by the second caller from Room 15. And, he was seen outside Room 15, where the most recent threat with a gun occurred, right after the caller reported it, and fled when asked to show his

14

hands. Given his location and that he was also at least partially consistent with the witness' description, a reasonable officer would not immediately dismiss him as a suspect. See Est. of Taylor v. Salt Lake City, 16 F.4th 744, 773 (10th Cir. 2021) (noting that a report of flashing a gun, even if a low level of threat or even if not a crime at all, does not mean a reasonable officer is required to drive away and not engage a suspect).

Second, tripping or stumbling while running is not necessarily indicative of intoxication, and even if it was, that does not mean that Mr. Palacios would be unaware it was police officers chasing him.[6] See Coronado v. Olsen, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. Jan. 18, 2022) (unpublished). Furthermore, even if officers could perceive a suspect was intoxicated, "a reasonable police officer would understand [the suspect] still posed a substantial and immediate threat" and that the suspect can be more unpredictable. Id. Particularly so here, when Mr. Palacios was suspected of just threatening multiple individuals with a gun despite being intoxicated.

Lastly, Plaintiff argues that Mr. Palacios' actions overall are indicative of someone "attempt[ing] to avoid confrontation with unknown persons," and not to evade arrest. Aplt. Reply Br. at 15. First, any suspect fleeing from the police could be characterized as "attempting to avoid confrontation." Second, as described above, it was reasonable under the circumstances for Officers Iversen and Fortuna to conclude that Mr. Palacios knew he was being confronted by the police. Thus, this factor weighs in favor of Defendants.

---

[6] To the extent Plaintiff argues that Mr. Palacios' intoxication was obvious because his blood alcohol content was 0.192, this fact was unavailable to the officers prior to pursuing him. Aplt. Reply Br. at 6–7; 3 Joint App. 88. Thus, it is irrelevant to the inquiry. See Taylor, 16 F.4th at 748 n.1.

15

### 3. Factor 2: Immediate Threat to the Officers or Others

To determine whether there was an immediate threat to the officers or to others, we consider the four nonexhaustive Larsen factors. Est. of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008). These factors are (1) whether the suspect was given orders and the suspect's compliance with the orders; (2) whether any hostile motions were made toward the officers; (3) the physical distance between the officers and the suspect; and (4) the manifest intentions of the suspect. Id.

### a. Ordered to Drop Weapon and Compliance

If a suspect was given orders and did not comply, this weighs in the officers' favor. See id. Here, Mr. Palacios was ordered to "drop it" or show his hands by four different officers (Iversen, Kilgore, Fortuna, and Sergeant Schneider) at least eighteen times before deadly force was used. He did neither. Plaintiff argues that deadly force is only reasonable when warning has been given, and that officers failed to warn Mr. Palacios before they opened fire despite it being feasible to do so. Aplt. Br. at 24.

However, Mr. Palacios received many verbal commands and warnings to drop his weapon and had at least three clear opportunities to do so, instead maintaining possession. For example, Officer Fortuna shouted "Drop the gun!" and "Drop it!" five times, and then Mr. Palacios picked up the gun. These warnings were given about four seconds prior to opening fire and when the gun was out of Mr. Palacios' possession, yet Mr. Palacios picked up the gun again. Thus, this is not a case where Mr. Palacios received no warning or had no opportunity to comply. This court has held the warning

16

does not need to be specifically that officers are about to open fire. See Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1318–19 (10th Cir. 2009). Here, Mr. Palacios was given many warnings over the course of the pursuit and not only ignored them, but also kept picking up his gun. This factor weighs in favor of Defendants.

### b. Hostile Motions Made "Toward the Officers"

Plaintiff argues that the danger to officers must be present at the precise moment force is used. See Sevier, 60 F.3d at 699. And, that when the officers began to fire, Mr. Palacios was not a threat because he was facing away from them and not pointing a weapon at them. Aplt. Br. at 24, 33. Plaintiff contends that because Mr. Palacios did not make a threat directly towards police, such as not ambushing Officer Iversen and not pointing the gun at officers,[7] he took no hostile action. First, simply because a suspect has not yet fired a weapon does not mean that he will not do so in the future, particularly when intentionally keeping his gun with him. See Valverde, 967 F.3d at 1062. Second, Mr. Palacios had been warned, repeatedly, to drop the gun. The videos show that Mr. Palacios brought his hands to the front of his body immediately after both Officer Iversen and Officer Fortuna watched him pick up a gun for the third time, and immediately after several warnings to "Drop it" were again given. And, from Officer Southworth's body camera, the gun was found on top Mr. Palacios' left hip, outside the waistband. Before firing, a reasonable officer

---

[7] It is undisputed that Mr. Palacios did not point a gun at Officer Iversen during the chase prior to reaching the Granary Storage parking lot.

would not only know that Mr. Palacios had possession of a gun, but also that it was out, that Mr. Palacios affirmatively kept it with him despite warnings otherwise, and that he was suspected of having just used it to threaten at least two people.

"Perhaps a suspect is just pulling out a weapon to discard it rather than to fire it. But waiting to find out what the suspect planned to do with the weapon could be suicidal." Id. Here, a reasonable officer would not consider that Mr. Palacios was going to discard his weapon, given that he picked it up three times. In Taylor, the court concluded the officer had a split second to decide, when it was unclear what the suspect was doing with his hands, if the suspect was attempting to draw or use a weapon. Taylor, 16 F.4th at 770 & n.10. The court reasoned when the suspect previously was noncompliant with officer commands, the undisputed facts did not reasonably suggest that the suspect abruptly decided to become compliant. Id. There, the suspect turned out to be unarmed, but the officer's actions were still objectively reasonable. Id. at 766–67. An officer can act reasonably even with a mistaken view of the facts. See id. at 765. Here, a reasonable officer would see a suspect who just picked up his gun and brought it in front of him, ignoring officer commands, as making a hostile motion. This factor weighs in favor of Defendants.

### c. Distance Between Officers and Mr. Palacios

In Larsen, this court found that a distance between 7 and 20 feet heightened the immediacy of the danger and supported a finding of objective reasonableness of the use of deadly force. Larsen, 511 F.3d at 1260–61. Further, this court in Taylor found that a distance of 10 to 20 feet, particularly where the officer was exposed and lacked cover,

supported the objective reasonableness of deadly force.  16 F.4th at 769–70.  Here, the videos show that Officers Iversen and Fortuna were close to Mr. Palacios when they opened fire and each testified that the distance was about 15 to 20 feet.  The officers were without cover, while Mr. Palacios was headed in the direction of the storage facility which had more cover.  2 Joint App. 213.  Plaintiff does not argue to the contrary.  Thus, the distance between the officers and Mr. Palacios weighs in favor of Defendants.

### d.  Manifest Intentions of Mr. Palacios

Plaintiff makes no direct argument regarding this Larsen factor, but speculates throughout that Mr. Palacios intended to avoid confrontation, supported by the fact he never directly threatened the officers or stopped to ambush Officer Iversen when the opportunity presented itself.  See Aplt. Br. at 23–24.  However, the inquiry is not what Mr. Palacios subjectively intended, but how a "reasonable officer on the scene would have assessed the manifest indicators of [Mr. Palacios'] intentions."  Taylor, 16 F.4th at 770.  Considering Mr. Palacios' conduct, he (1) was discovered outside the room where, minutes earlier, two men threatened the occupant with a gun; (2) fled police when asked to show his hands; (3) continued to ignore repeated warnings from multiple officers; and (4) while running, had at least three clear opportunities to leave his gun and instead continued to pick it up and maintain it in his hand.  As described above, a reasonable officer in Officer Iversen's and Officer Fortuna's positions would conclude that Mr. Palacios made hostile gestures and manifested a hostile intent.

In sum, the second Graham factor, immediate threat to officers or others, weighs in favor of Defendants.

19

### 4.  Totality of the Circumstances

The Graham factors are nonexhaustive and the test is not mechanical.  See Graham, 490 U.S. at 396.  While the preceding discussion shows that the factors weigh in favor of Defendants, Plaintiff makes several arguments regarding the totality of the circumstances and that overall the district court failed to draw reasonable inferences in her favor.  She contends the district court erred by (1) not considering that Mr. Palacios was intoxicated and less able to engage in "lethal confrontation," Aplt. Br. at 24–25; (2) that circumstances changed after Mr. Palacios fell to the ground such that it became objectively unreasonable to continue shooting, Aplt. Br. at 40–44; and (3) there were less intrusive means available, as suggested by Sergeant Schneider to "Tase him!" despite Sergeant Schneider's belief that Mr. Palacios had a gun, and at least one opportunity to tase Mr. Palacios, Aplt. Br. at 25.

First, as described previously, intoxication does not make a person less able to engage in confrontation and in fact can increase unpredictable behavior.  Next, Plaintiff argues that officers had enough time (three seconds) to stop shooting when Mr. Palacios fell onto his side after the first shots were fired, before rolling onto his back.  Aplt. Br. at 37.  She argues the district court erred by not drawing reasonable inferences in her favor, such as that it is unclear what Mr. Palacios was doing with his hands while on the ground and Sergeant Schneider's shouts of "Alright!" indicate the officers should have stopped shooting.  Aplt. Br. at 37–40.

First, Sergeant Schneider was behind Officers Iversen and Fortuna when they initially began to fire such that he did not have the same perspective.  2 Joint App.

20

164, 171–72.  He was not facing Mr. Palacios squarely, but moving to the right.

Second, he shouted "Alright!" to attempt to recenter the other two officers and

potentially get them out of tunnel vision, if they were experiencing that.  2 Joint App.

163.  Sergeant Schneider testified that it was not a command, and he was not telling

them to stop shooting and only wanted to assist if he could.  Id.  Sergeant Schneider's

perspective is not categorically irrelevant but because he was not in the same position

as the officers who fired and did not observe the same circumstances, his choices do

not inform what a reasonable officer in Officer Iversen's and Officer Fortuna's

positions would see and do.  See Valverde, 967 F.3d at 1065.

While it is possible that an initial reasonable decision to use deadly force may

become unreasonable later, these facts do not support that conclusion.  See Smart,

951 F.3d at 1177–78; cf. Perea v. Baca, 817 F.3d 1198, 1203 (10th Cir. 2016).  The

mere fact that a suspect has fallen does not mean it is unreasonable to continue to

fire.  Smart, 951 F.3d at 1176.  Plaintiff maintains there is a genuine dispute of

material fact on whether Mr. Palacios was surrendering once he was on the ground.

It is unclear the exact motion that Mr. Palacios made, however, this is immaterial.

The clear video evidence shows that as Mr. Palacios fell to the ground, he then began

to roll over and move his hands near his waist.  Plaintiff concedes that it is

undisputed that he is moving.  Aplt. Br. at 37–38.  A reasonable officer would not

perceive that the threat had ended and that Mr. Palacios was effectively subdued

merely because he fell, given that he repeatedly maintained possession of a gun.

Even if Officers Iversen and Fortuna were mistaken as to what Mr. Palacios was

doing, it is not unreasonable to conclude that hand motions near the waist, as he rolled over, could indicate that Mr. Palacios was preparing to shoot. Mr. Palacios still had possession of his gun and was not immobile, thus a changed circumstances analysis is inapplicable.

Plaintiff's third argument is that officers could have used a taser, supported by Sergeant Schneider's suggestion to tase Mr. Palacios. Again, Sergeant Schneider was behind and to the right of Officers Iversen and Fortuna, at least 10 or 15 yards away, when he yelled to tase Mr. Palacios, and testified he could not see 100% of what Mr. Palacios was doing. 2 Joint App. 164, 171. Thus, his suggestion does not mean that it was unreasonable for Officers Iversen and Fortuna to use deadly force. Moreover, the least intrusive or restrictive means possible are not required, only reasonable means. Taylor, 16 F.4th at 773. Plaintiff also argues that the location of the shooting would allow a jury to conclude that it was unreasonable to use deadly force because pedestrians may have been in the area and bullets were found in a surrounding building. Aplt. Br. at 28. The test for reasonableness accounts for the fact that officers are often "forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396–97.

To be clear, pursuing a fleeing felon does not automatically mean that a decision to use deadly force is objectively reasonable. See Garner, 471 U.S. at 11. Rather, under the totality of circumstances, here a reasonable officer would know that Mr. Palacios was suspected of involvement in two violent felonies where bystanders were threatened with a gun, fled police, continually ignored warnings to drop his gun,

was running around corners where it was possible to ambush officers, had his gun out, and picked up his gun repeatedly after being told to drop it. Thus, under the totality of the circumstances it was reasonable for the officers to use deadly force.

### 5. Harmening Declaration

Lastly, Plaintiff argues the declaration of her expert witness, Mr. William Harmening, who served as a law enforcement officer for 37 years and as a police instructor, was erroneously disregarded by the district court. Aplt. Br. 29–31, 48–49; see Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1250 (10th Cir. 2013). Before the district court, Plaintiff conceded some of Mr. Harmening's statements were impermissible and properly excluded. 4 Joint App. 29. Plaintiff now primarily relies on Mr. Harmening's opinion that a reasonable officer would have interpreted Mr. Palacios' movement on the ground as a gesture of surrender or self-defense. Aplt. Br. at 48–49. Plaintiff also argues that Mr. Harmening's opinions as to how officers should have interpreted Mr. Palacios' actions show there is a genuine factual dispute, i.e., that Mr. Palacios never pointed the gun at the officers while running means that he did not intend to use his weapon; and, that a reasonable officer would have understood that a taser could have been used under the circumstances. Id. at 30.

Mr. Harmening's declaration is irrelevant because the only question before this court is the objective legal question of whether the officers acted reasonably under the totality of the circumstances. The universe of undisputed facts to consider on summary judgment excludes characterizations of facts and legal arguments. See

Taylor, 16 F.4th at 759 n.7.  Plaintiff's argument that Mr. Harmening's declaration shows there are different factual inferences to be drawn from the videos, thus there are material disputed facts, is misplaced.  We have reviewed the video evidence in this case extensively and made reasonable factual inferences in Plaintiff's favor where not contradicted by video evidence.  Although tragic, these facts do not rise to a constitutional violation.  Moreover, to the extent Mr. Harmening opined about what an officer could have concluded or otherwise done under these circumstances based on his years of experience, this is exactly the type of hindsight analysis that we are reluctant to conduct.  See Valverde, 967 F.3d at 1065 (finding plaintiff's police-practices expert's affidavit unpersuasive because it did not address the situation from the officer's perspective, which required a split-second judgment); see also Thomson, 584 F.3d at 1321 (concluding same).

An officer's belief need not be correct, so long as it is reasonable.  Taylor, 16 F.4th at 765.  And, officers are not required to "await the glint of steel" before taking protective action.  Valverde, 967 F.3d at 1063 (quoting Larsen, 511 F.3d at 1260).  The question is only whether it is objectively reasonable for an officer under the totality of the circumstances to use deadly force.  We find that there was no constitutional violation.

## B. Clearly Established Law

Having determined that there is no constitutional violation, it is unnecessary to consider whether the law was clearly established at the time of the incident.  See Pearson, 555 U.S. at 236.

24

### C.  Claim Against Salt Lake City Corporation

Because there is no constitutional violation, the district court properly found that Plaintiff's claim against Salt Lake City Corporation fails.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978).

AFFIRMED.