FILED
**United States Court of Appeals**
**Tenth Circuit**

**November 26, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

LORENZO CLERKLEY, JR.,

    Plaintiff - Appellee,

v.

KYLE HOLCOMB,

    Defendant - Appellant,

and

CITY OF OKLAHOMA CITY,
OKLAHOMA,

    Defendant.

No. 23-6128

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CV-00465-F)**

_____

Stacey Haws Felkner (Stephen L. Geries with her on the briefs), of Collins Zorn & Wagner, Oklahoma City, Oklahoma, for Defendant-Appellant.

Robert M. Blakemore (Daniel E. Smolen and Bryon D. Helm with him on the brief), of Smolen & Roytman, Tulsa, Oklahoma, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **MORITZ**, and **CARSON**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

In March 2019, a group of teenage boys entered a vacant house to play with BB guns. A concerned neighbor called 911, and Officer Kyle Holcomb and an Oklahoma City Police Department colleague responded. Within minutes, Holcomb shot and injured one of the boys: 14-year-old Lorenzo Clerkley.

Clerkley sued Holcomb under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from excessive force. Holcomb moved for summary judgment on qualified-immunity grounds, asserting that his use of force was reasonable because he saw Clerkley pointing a gun at him. Clerkley maintained that his hands were empty when Holcomb fired. Accepting Clerkley's version of events, the district court held that Holcomb's use of force violated clearly established Fourth Amendment law.

Holcomb raises factual and legal challenges to that decision on interlocutory appeal. We lack jurisdiction to review the former and find no merit in the latter, so we affirm.

## Background[1]

On March 10, 2019, the Oklahoma City Police Department fielded a 911 call about a second-degree burglary in a high-crime neighborhood. The caller reported seeing several Black men entering a vacant house, at least one of whom had dreads and was carrying a gun.

---

[1] Given the procedural posture of this appeal, we rely on the district court's recitation of the facts. *See Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1152–53 (10th Cir. 2010).

Holcomb and Officer Carlon Tschetter responded to the call. Shortly after arriving at the scene, Tschetter heard popping noises. He radioed "cap gun"[2] and headed toward the front door, shouting, "Hey! Police department! Come on out!" App. vol. 2, 500 (quoting Holcomb Body-Worn Camera Footage #1 (Holcomb BWC) at 0:58–1:04). Holcomb, meanwhile, went around the side of the house and toward the fenced backyard. As he skirted the wooden fence, he heard more sounds and radioed: "I think it's a cap gun, but they are shooting something off." *Id.* (quoting Holcomb BWC at 1:11–1:15). Tschetter responded that it "could be paint ball" and again called for everyone to come out. *Id.* (quoting Tschetter Body-Worn Camera Footage at 1:24–1:25).

Holcomb stopped at a hole in the fence and looked into the backyard, gun drawn. Moments later he "saw a [B]lack male"—Clerkley, who partially matched the 911 caller's description of the armed man—"near the corner of the house walking in his direction." *Id.* Holcomb shouted, "Show me your hands! Drop it!" and "immediately fired four shots in quick succession," before again yelling, "Drop the gun!" *Id.* (quoting Holcomb BWC at 1:27–1:32). Clerkley disappeared from sight and Holcomb radioed: "Shots fired. Shots fired. Black male with a gray hoodie had the gun." *Id.* at 500–01 (quoting Holcomb BWC at 1:32–1:36).

---

[2] A cap gun is a "toy pistol with a hammer action that detonates a mildly explosive cap." *Cap gun*, The American Heritage Dictionary of the English Language (2022), https://www.ahdictionary.com/word/search.html?q=cap%20gun [https://perma.cc/7665-YFHP]; *see also United States v. Forrest*, 402 F.3d 678, 682 (6th Cir. 2005) (characterizing a cap gun as a "toy" gun).

Clerkley had been shot twice—in his right hip and left leg—and had fallen backward. A friend helped him back inside, and he surrendered to police at the front of the house.

The whole encounter lasted seconds, but the parties took starkly different views of it. Holcomb testified at his deposition that Clerkley was holding what looked like a black handgun and, when he ordered him to drop it, Clerkley pointed it at Holcomb, who fired. Clerkley told the police that his hands were empty and that he was holding them up, as ordered, when he was shot. He also said that he and his friends had been playing with BB guns inside the house but that he had left his "Glock"-style BB gun in the kitchen before exploring the backyard. Police found two "Glock"-style BB guns in the house and a TDP 45 BB pistol in the backyard, where two of Clerkley's friends were arrested.

Clerkley sued Holcomb for excessive force under § 1983.[3] Holcomb moved for summary judgment on qualified-immunity grounds, arguing that his use of force was constitutionally permissible. The district court reviewed the evidence, including Holcomb's body-camera footage, stills captured from that video, and statements from Holcomb and Clerkley. Drawing all reasonable inferences in Clerkley's favor, it found that "a reasonable jury could conclude that Holcomb fired his gun at Clerkley when he could see he did not have a gun or anything in his hand" and that a

---

[3] Clerkley's suit, which his mother filed on his behalf because he was a minor, also brought claims against Oklahoma City, but those claims are not at issue in this appeal.

reasonable officer would not have "believed that Clerkley posed a mortal threat." *Id.* at 514. It held that using deadly force in those circumstances violated clearly established Fourth Amendment law and denied Holcomb's motion.

Holcomb then filed this interlocutory appeal.

## Analysis

Holcomb asks us to reverse the district court's denial of qualified immunity, arguing that (1) we should review and reject the district court's finding that Clerkley was unarmed based on blatantly contradictory evidence; (2) Holcomb's use of deadly force was constitutionally justified; and (3) even if it wasn't, the law prohibiting its use was not clearly established. We reject each of those challenges.

## I.    Scope of Review

On interlocutory appeal of an order denying qualified immunity, we generally have jurisdiction only over "abstract questions of law." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021). This means we must take as true "any facts that the district court assumed in denying summary judgment" and focus on the legal issues. *Id.* (quoting *Amundsen v. Jones*, 533 F.3d 1192, 1196 (10th Cir. 2008)). Our review is thus confined to qualified immunity's two prongs: whether the facts "suffice to show a legal violation" and "whether that law was clearly established at the time of the alleged violation." *Id.* (quoting *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1058 (10th Cir. 2020)).

But there are "narrow" exceptions to that general rule. *Est. of George v. City of Rifle*, 85 F.4th 1300, 1313 (10th Cir. 2023), *cert. denied*, 2024 WL 4426604 (Oct. 7,

2024). If the district court "fails to identify" the facts upon which its decision is based, or if the "'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,'" the court may conduct its own review of the evidence. *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Holcomb asks us to exercise the blatant-contradiction exception to revisit the district court's assessment of the shooting. In his view, the district court's finding that "Holcomb fired his gun at Clerkley when he could see [Clerkley] did not have . . . anything in his hand," App. vol. 2, 514, "is contrary to . . . the zoomed still-frame from Holcomb's [body-camera footage, which] shows a black object in or near Clerkley's right hand," Aplt. Br. 14.[4]

But the evidence Holcomb cites does not meet the "very difficult" standard for invoking de novo review of the record. *Wise v. Caffey*, 72 F.4th 1199, 1206 (10th Cir. 2023) (quoting *Crowson v. Wash. Cnty.*, 983 F.3d 1166, 1177 (10th Cir. 2020)). The zoomed still-frame and video offer a pixelated view of Clerkley in the backyard of the vacant house, arms near his sides, partially obscured by fencing and brush. The low resolution and obstructing vegetation make it difficult to see much detail, but as the district court found, "the footage and the still-framed photographs do not show that Clerkley was holding something black in his hand." App. vol. 2, 512. Absent

---

[4] To be precise, the district court found that a reasonable jury could find that Clerkley was unarmed. For simplicity's sake, we describe such assumed facts as district-court findings.

such clarity, Holcomb cannot show that the district court's recitation of the facts amounts to a "visible fiction." *Wise*, 72 F.4th at 1206 (quoting *Crowson*, 983 F.3d at 1177). Accordingly, we must accept the district court's finding that Clerkley was unarmed.

We also defer to the district court's related finding that "Holcomb's mistaken perceptions—that Clerkley was pointing a gun at him at the precise moment he fired his gun and that Clerkley posed a serious threat of physical harm to Holcomb or others—were not reasonable." App. vol. 2, 513–14. Holcomb casts this as a legal issue we should decide de novo, but we have previously characterized the reasonableness of an officer's belief that a plaintiff posed a threat as a factual question. *See Finch v. Rapp*, 38 F.4th 1234, 1242 (10th Cir. 2022) ("Whether [the officer] reasonably believed [the plaintiff] presented any threat is a genuine issue of fact for the jury to determine."); *Packard v. Budaj*, 86 F.4th 859, 866–67 (10th Cir. 2023) (explaining the court was "bound" by district court's finding as to "whether officers 'reasonably believed' a subject 'presented any threat'" (quoting *Finch*, 38 F.4th at 1242)); *Maestas v. Lujan*, 351 F.3d 1001, 1010 (10th Cir. 2003) (authorizing jury to decide "the objective reasonableness of [an officer]'s actions" when "disputed issues of material fact . . . are dispositive").

As we analyze Holcomb's remaining challenges, we are thus bound by the district court's findings that Clerkley was unarmed and that Holcomb unreasonably

believed he posed a threat.[5]

## II.    Constitutional Violation

Holcomb asserts that the district court erred in concluding that his use of force was unconstitutional. We review this issue de novo. *See Vette*, 989 F.3d at 1169.

Excessive force claims are governed by the Fourth Amendment's "'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer's use of force is unconstitutional if it is "objectively unreasonable" as "judged from the perspective of a reasonable officer on the scene." *Id.* at 396–97. We evaluate reasonableness considering the totality of the "facts and circumstances," with particular attention to three factors identified in *Graham*: "[1] the severity of the crime at issue, [2] whether the [person] poses an immediate threat to the safety of the officers or others, and [3] whether [the person] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The parties agree that the first *Graham* factor favored Holcomb because, as a felony, second-degree burglary carries a "high degree of severity." App. vol. 2, 509 (quoting *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023)).

But the parties see the second *Graham* factor differently. In the Tenth Circuit, courts parse out the threat posed using the four *Larsen* factors: "(1) whether the

---

[5] Clerkley argues that Holcomb's appeal is so "centered on disputed factual issues" that we should decline to exercise jurisdiction over it altogether. Aplee. Br. 3. Although some of Holcomb's arguments turn on those disputes, others do not. We therefore accept "the facts the district court 'conclude[d] a reasonable jury could find'" and resolve the legal questions on the merits. *Surat v. Klamser*, 52 F.4th 1261, 1270 (10th Cir. 2022) (alteration in original) (quoting *Vette*, 989 F.3d at 1162).

officers ordered the [person] to drop his weapon, and the [person's] compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the [person]; and (4) the manifest intentions of the [person]." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Reviewing the record through *Larsen*'s lens, the district court determined that: (1) Clerkley complied with Holcomb's orders to "show his hands" and "drop 'it,'" to the extent he could, given that Holcomb fired "immediately after giving the commands"; (2) Clerkley was unarmed and raising his empty hands when he was shot, so he could not have made any "hostile motions" with a weapon toward Holcomb; (3) Holcomb was "not far" from Clerkley and protected only partially by a wooden fence during the encounter; and (4) Clerkley did not manifest any "hostile intentions." App. vol. 2, 511–13. Based on these factors (three of which favored Clerkley) and the totality of the circumstances, the district court found that "there was no threat of serious physical harm to Holcomb or others." *Id.* at 510. And, it continued, because Holcomb fired his gun when he could "see" that Clerkley's hands were empty, Holcomb did not "reasonably believe[] that Clerkley posed" such a threat. *Id.* at 514.

Holcomb seeks to undermine that assessment primarily by reiterating his allegation that "he saw a suspect with what appeared to be a gun pointed in his direction." Aplt. Br. 32. But we are bound by the district court's factual findings that Clerkley was visibly unarmed, so we lack jurisdiction to entertain these attacks. *See*

*Vette*, 989 F.3d at 1167.

His remaining challenges likewise come up short. He contends, for instance, that in analyzing the first *Larsen* factor, the district court should have ignored that Clerkley was raising his hands because "this action is not visible on Holcomb's [body camera]," Aplt. Br. 32, and therefore does not fall within the scope of "information the officer[] had at the time of the encounter," *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 748 n.1 (10th Cir. 2021) (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 812 n.3 (10th Cir. 2020)). But Holcomb's body camera does not necessarily capture everything he saw, so the district court acted appropriately in considering Clerkley's actions as part of the totality of the evidence.

Holcomb also argues that in analyzing Clerkley's "manifest intentions" for purposes of the fourth *Larsen* factor, the district court failed to consider the totality of the information available to Holcomb. 511 F.3d at 1260. He selects several facts that purportedly convey Clerkley's hostile intent, including that he saw Clerkley "in the fenced backyard of a house the 911 caller had identified as vacant," that "Clerkley [partially] fit the 911 caller's description of the suspect with a gun," and that his fellow officer had just shouted for everyone to "come on out." Aplt. Br. 36 (quoting Holcomb BWC at 1:00–1:21). At most, these facts suggest an intent to evade the police, not to harm Holcomb or anyone else. And that is not enough to push this factor into his column. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding deadly force is not justified to apprehend "unarmed, nondangerous" person fleeing burglary).

10

Together, the *Larsen* factors make clear that Clerkley posed no threat to Holcomb and that a reasonable officer would have recognized as much. This, alone, is dispositive of a Fourth Amendment violation in this context, because deadly force is constitutional only "if a reasonable officer . . . would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Zia Tr.*, 597 F.3d at 1154 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006)); *see also Reavis Est. of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (emphasizing importance of second *Graham* factor in deadly force cases). So even if the third *Graham* factor—whether Clerkley actively resisted or attempted to evade arrest—weighs in Holcomb's favor, as he urges, the totality of the facts and circumstances establish that Holcomb's use of deadly force was unconstitutional. *See Graham*, 490 U.S. at 396.

## III.    Clearly Established Law

Holcomb alternatively argues that his use of force did not violate Clerkley's "clearly established statutory or constitutional rights." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We likewise review this issue de novo. *See Vette*, 989 F.3d at 1169.

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Plaintiffs typically show this by citing a factually similar Supreme Court or Tenth Circuit decision published before the events at issue occurred. *See Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021).

11

Here, the district court held that Holcomb's use of deadly force violated Clerkley's clearly established rights by analogizing heavily to *Finch*, 38 F.4th 1234, a 2022 case affirming the denial of qualified immunity for a 2017 shooting of an unarmed swatting[6] victim killed while standing on his porch. That case relied on several other cases published before the 2017 shooting to hold that "an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect." *Id.* at 1243.

Holcomb argues that relying on *Finch* violates the general rule "that cases decided after [the underlying incident] are of '*no use* in the clearly established inquiry.'" *Lewis v. City of Edmond*, 48 F.4th 1193, 1199 (10th Cir. 2022) (alteration in original) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9 (2021)). This rule reflects the simple fact that an officer involved in a shooting today does not have "fair notice" of the law announced in a decision published tomorrow. *Kisela v. Hughes*, 584 U.S. 100, 107 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004)). Later published decisions may still, however, be "instructive as to . . . whether [an officer's] conduct violated a clearly established right" if they evaluate the historical state of the law. *Finch*, 38 F.4th at 1243. For example, in *Finch*, we looked to *Huff v. Reeves*, 996 F.3d 1082 (10th Cir. 2021), a case published after the 2017 swatting incident that analyzed the clearly established law as of 2016. *See*

---

[6] "Swatting involves placing a hoax emergency call reporting serious threats to provoke an armed law[-]enforcement response to an individual's residence, usually as an act of harassment or revenge." *Finch*, 38 F.4th at 1237.

*Finch*, 38 F.4th at 1243. It follows that we can look to *Finch* here, particularly for its discussion of pre-2017 caselaw.

Holcomb next complains that the cases *Finch* drew on are too factually disparate to be useful here. Those cases involved officers who shot: a man holding a pair of nail clippers after someone yelled that he had a knife, *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989); a driver of a van stuck on a pile of rocks whose vehicle jumped forward, *Zia Tr.*, 597 F.3d at 1153; a suicidal man holding a knife to his own wrist, *Walker*, 451 F.3d at 1144–45; a hostage fleeing her captor's vehicle with her hands up, *Huff*, 996 F.3d at 1085–87; and an unarmed, mentally ill man with a jacket draped over one arm, *King v. Hill*, 615 F. App'x 470, 471–73 (10th Cir. 2015). As Holcomb notes, none of these cases involved officers who heard shots when they arrived at the scene. But that factual distinction reeks of red herring. What unites these decisions addressing different types and degrees of potential danger is that in each case, as in this one, a reasonable officer would have recognized that the plaintiff was unarmed and nonthreatening.[7]

It was therefore clear in 2019 that an officer responding to a potentially dangerous situation could not use deadly force against an unarmed, nonthreatening person. Holcomb's conduct, viewed in a light most favorable to Clerkley, violated

---

[7] Holcomb also complains that the district court defined the clearly established right too generically. But the district court simply adopted the formulation of the right we identified in *Finch*, so this critique falls flat.

that clearly established law.[8]

## Conclusion

Considering the totality of the facts and circumstances credited by the district court, Holcomb's use of deadly force against an unarmed, nonthreatening person violated clearly established Fourth Amendment law. The district court correctly denied him qualified immunity, so we affirm.

---

[8] Holcomb finally argues that the district court erred by implying that a jury could decide the issue of clearly established law. But the district court's lengthy analysis of clearly established law proves it did not disclaim its role.