FILED
United States Court of Appeals
Tenth Circuit

January 8, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LAQUITA BRUNER, as Administrator of
the Estate of Dawawn Q. McCoy,

     Plaintiff - Appellee,

v.

OFFICER KELLY CASSIDY, an
individual; OFFICER BRANDON LEE, an
individual; OFFICER ROBIN RIDNER, an
individual,

     Defendants - Appellants.

and

CITY OF OKLAHOMA CITY, a
municipal corporation; CHIEF WADE
GOURLEY, an individual; OKC JOSEPH
INVESTMENTS, LLC, d/b/a Biltmore
Hotel, an Oklahoma limited liability
company,

     Defendants.

No. 23-6216

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:22-CV-00199-HE)**
_____

Chris J. Collins (Stacey Haws Felkner and W.R. Moon, Jr. with him on the briefs), of
Collins Zorn & Wagner, PLLC, Oklahoma City, Oklahoma, for Defendants-Appellants.

Brittini L. Jagers-Johnson, of Jagers & Johnson, Attorneys at Law, PLLC, Oklahoma
City, Oklahoma for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

In this interlocutory appeal, Appellants officers Cassidy, Lee, and Ridner challenge the district court's decision to deny them qualified immunity on Appellee Bruner's 42 U.S.C. § 1983 excessive force claim.  Having jurisdiction under 28 U.S.C. § 1291, see Mitchell v. Forsyth, 472 U.S. 511, 530 (1985), we AFFIRM.

## I. BACKGROUND

Because this case comes to us on an interlocutory appeal of a denial of qualified immunity at the summary judgment stage of litigation, we must "take as true the facts the district court has determined a reasonable jury could find at trial." McCowan v. Morales, 945 F.3d 1276, 1280 (10th Cir. 2019) (quoting Walton v. Powell, 821 F.3d 1204, 1207 (10th Cir. 2016)).  "[W]e are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." Zia Tr. Co. ex rel. Causey v. Montoya, 597 F.3d 1150, 1152 (10th Cir. 2010) (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1154 (10th Cir. 2008).  Therefore, we give the following facts as determined by the district court.

On March 27, 2020, at approximately 1:25 a.m., a security guard at the Biltmore Hotel in Oklahoma City, Oklahoma called 911 to report that an

2

unauthorized individual was refusing to leave a guest's room at the hotel.  The guard

reported that the individual, later identified as Dawawn McCoy, seemed "high" and

was insisting that he could not walk.  Sergeant Kelly Cassidy of the Oklahoma City

Police Department (OCPD) responded to the call and made contact with McCoy.

During their conversation, McCoy refused to leave voluntarily and indicated that he

could not walk, so Cassidy requested emergency medical personnel.  Fire department

personnel arrived first and evaluated McCoy, concluding he showed no signs of

needing immediate medical attention.  McCoy also refused medical care and

transportation to a hospital.  As a result, an ambulance that was on the way with

emergency medical personnel was cancelled.

At the time of this incident, the county was not jailing persons for minor

crimes due to COVID protocols, so Cassidy contacted his supervisor, Lieutenant

Reeder, for guidance on how to proceed with McCoy.  Reeder advised him to get a

citation for trespass signed by the hotel security guard, and then place McCoy under

arrest and escort him off the hotel property.  Anticipating that they might need to

carry McCoy in light of his refusal to stand up, Cassidy called for additional officers

to assist in arresting McCoy and removing him from the premises.

Sergeant Brandon Lee and Officer Robin Ridner responded to the call.  The

three officers turned on their body worn cameras and walked into the room where

McCoy was lying on top of the made bed.  Cassidy explained to McCoy that he was

trespassing, and he could choose either to leave the premises voluntarily or be

3

handcuffed and escorted off.  McCoy again refused to leave voluntarily, insisting that he was unable to stand up.

Cassidy proceeded to move toward McCoy and attempt to place McCoy in handcuffs.  The other two officers moved in to assist as McCoy pulled his hands in to his chest and it was clear he was not going to be compliant.  McCoy refused the officers' orders to put his hands behind his back, stating, "I can't get my hands behind my back," despite actively gesturing with his hands and resisting officers' efforts to force them back.  (Lee BWC 1:29–1:38.)  As the officers engaged in physical force to handcuff McCoy, McCoy resisted by kicking his legs and feet.  The officers believed that McCoy seemed "abnormally and uncommonly strong."  Aplt. Br. 13.

The officers proceeded to struggle with McCoy for roughly five minutes as he resisted handcuffing.  About a minute into the struggle, the officers warned McCoy that they were going to pepper spray him and proceeded to do so twice.  It did not appear to have much effect on McCoy.  A couple minutes after that, Lee warned McCoy that he would be tased if he did not stop kicking.  About ten seconds later, Lee deployed his taser twice in the back of McCoy's leg.  The officers were then able to handcuff McCoy with his hands behind his back, though he continued to yell and kick his legs around.

At this point, McCoy was lying on his side on the floor.  Officers then rolled him onto his stomach.  The district court acknowledged that the body cam videos are not entirely clear on what happened but found that, "viewed in the light most

4

favorable to [Appellee], the videos support an inference that there was a period of roughly a minute and a half during which McCoy had stopped resisting and was face down with one officer's knee in McCoy's back, while another officer pressed McCoy's bent legs against his buttocks." (Dist. Ct. Order 5.)  At the end of that period, the officer with his knee on McCoy's back stood up and released the pressure on McCoy's back, while McCoy's legs remained bent up toward his buttocks for several more minutes.

As McCoy continued to lay in this position on his stomach, officers periodically asked him questions, checked his breathing, and twice rinsed his eyes with water to flush out the pepper spray.  However, they never received any verbal response other than a few grunts.  Approximately ten minutes after being placed in handcuffs, the officers noticed that McCoy's breathing appeared to have changed and his pulse was faint or missing.  They began CPR and called for emergency medical personnel.  The officers also administered multiple doses of Narcan in case McCoy was experiencing an overdose.  Emergency medical personnel arrived, took over CPR, and administered various other medical procedures before taking him to the nearest hospital.

McCoy died in the hospital six days later.  The medical examiner listed the cause of death as "hypoxic-ischemic encephalopathy following cardiac arrest in the setting of methamphetamine use and physical restraint."  Dist. Ct. Order 6.

## II. PROCEDURE

Plaintiff LaQuita Bruner, as Administrator of the Estate of Dawawn McCoy, brought suit under 42 U.S.C. § 1983 in the U.S. District Court for the Western District of Oklahoma against Appellants Sgt. Cassidy, Sgt. Lee, and Officer Ridner, as well as against the city of Oklahoma City and police Chief Gourley, all for violations of McCoy's constitutional rights.  Bruner also brought a negligence claim against the Biltmore Hotel.  Only the claims against the Appellant officers are at issue in this appeal.

Bruner claimed that the officers violated McCoy's Fourth Amendment rights by using excessive force against him and by their deliberate indifference to his medical needs.  The officers filed a motion for summary judgment on the grounds of qualified immunity for each of these claims.  The district court granted the officers' motion with respect to the deliberate indifference claims but denied the motion with respect to the excessive force claims.  The Order granting in part and denying in part the officers' motion for summary judgment was entered on November 28, 2023.  The officers timely filed this appeal on December 27, 2023.

## III. APPELLATE JURISDICTION

While we ordinarily lack jurisdiction to consider non-final orders, such as a denial of summary judgment, denials of qualified immunity are immediately appealable "to the extent that [the appeal] turns on an issue of law."  McWilliams v. Dinapoli, 40 F.4th 1118, 1122 (10th Cir. 2022) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)); see also Andersen v. DelCore, 79 F.4th 1153, 1159

6

(10th Cir. 2023) ("The reasonableness of an officer's use of force is a legal issue that we may resolve on an interlocutory appeal.") (citing McWilliams, 40 F.4th at 1122, 1124). "[We] review the denial of a summary judgment motion raising qualified immunity questions de novo." McCowan, 945 F.3d at 1281.

On interlocutory appeal of a summary judgment order denying qualified immunity, this court's jurisdiction is generally limited to "abstract questions of law," rather than a review of the district court's factual determinations. Clerkley v. Holcomb, 121 F.4th 1359, 1363 (10th Cir. 2024) (quoting Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1162 (10th Cir. 2021)); see also McCowan, 945 F.3d at 1282. "[I]t is generally the district court's exclusive job to determine which facts a jury could reasonably find from the evidence presented to it by the litigants." Lewis v. Tripp, 604 F.3d 1221, 1225 (10th Cir. 2010) (citing Johnson v. Jones, 515 U.S. 304, 313 (1995)). Thus, "if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, . . . we usually must take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." Id.; see also Vette, 989 F.3d at 1162 (quoting Lynch v. Barrett, 703 F.3d 1153, 1159 (10th Cir. 2013)).

However, there are exceptions to that general rule. Relevant here, "when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' we may assess the case based on our own de novo view of which facts a reasonable jury could accept as true." Lewis, 604 F.3d at 1225–26 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). This is a "very difficult"

standard that will only be satisfied when the district court's findings "constitute visible fiction." Vette, 989 F.3d at 1162 (quoting Crowson v. Washington Cnty., 983 F.3d 1166, 1177 (10th Cir. 2020)).

## IV. DISCUSSION

The officers make a factual and a legal challenge to the district court's decision to deny their summary judgment motion on the basis of qualified immunity.

### A. The body camera videos do not "blatantly contradict" the district court's findings that officers continued to use force after McCoy was subdued

Beginning with the factual dispute, the officers argue that during the several minutes after McCoy was handcuffed, McCoy was not subdued and was still resisting arrest. But the district court determined that a reasonable jury could find that McCoy was subdued when he stopped kicking, and yet the officers continued to use force for a minute and a half while he was subdued: "the [body camera] videos support an inference that there was a period of roughly a minute and a half during which McCoy had stopped resisting and was face down with one officer's knee in McCoy's back, while another officer pressed McCoy's bent legs against his buttocks." (Dist. Ct. Order 5.) Therefore, we must accept the district court's finding unless we conclude it is "blatantly contradicted" by the evidence. We cannot make such a conclusion.

The videos clearly show that McCoy is lying on his stomach during this ninety-second period with his hands cuffed behind his back, one officer's knee on his back, and another bending his legs up against his buttocks. The officers argue, however, that McCoy had not stopped resisting and still posed a threat during this

time because he continued kicking his legs.  Therefore, they assert, he was not subdued.

The videos do show McCoy moving his legs, but it is difficult to say whether he is kicking.  The officers point out that roughly twenty seconds into the minute-and-a-half period, the officer pressing down on McCoy's legs says, "quit kicking me!" and appears to be wrestling with McCoy's legs to keep them pressed down against his buttocks.  (Ex. 9, Cassidy BWC at 7:36–7:45.)  But the videos do not make the extent of McCoy's leg motions clear, and the fact that he was still moving his legs does not render the district court's conclusion that he had stopped resisting a "visible fiction."

To be sure, the officers argue that, in the context of the strenuous minutes-long struggle to get McCoy in handcuffs, it was reasonable for them to interpret his continued leg motions as resistance.  However, the reasonableness of the officers' understanding of the situation is a legal question, which we address below, and this contention does not contradict the district court's determination that a reasonable jury could find that McCoy had, objectively, stopped resisting.

## B. Given the facts found by the district court, the officers' use of force was not objectively reasonable

Turning to the legal question on appeal, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Andersen, 79 F.4th at 1162 (quoting Mullenix v. Luna, 577 U.S. 7, 11

9

(2015) (per curiam)).  When a defendant asserts a qualified immunity defense, this "creates a presumption that [the defendant is] immune from suit." Id. (quoting Smart ex rel. Est. of Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020)) (alteration in original).  "To overcome the presumption of immunity, the plaintiff bears the burden to establish that (1) the defendant violated his or her constitutional or statutory rights, and (2) 'that the right was clearly established at the time of the defendant's conduct.'" Id. (quoting Arnold v. City of Olathe, 35 F.4th 778, 788 (10th Cir. 2022)).

Therefore, we must first determine whether the officers' use of force against McCoy violated his constitutional rights.  Given the risks associated with the maneuvers the officers used, the lack of resistance from McCoy once he stopped kicking per the district court's finding, and the amount of time that the officers continued to exert substantial force upon McCoy after he was subdued, we find no error in the district court's conclusion that the officers' use of force was excessive and did violate McCoy's Fourth Amendment rights.

Claims against law enforcement officers alleging excessive force during an arrest implicate the Fourth Amendment's protections against unreasonable seizures. Id. at 1163 (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).  The Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.  Therefore, "[t]o establish a constitutional violation, the plaintiff must demonstrate the force used was objectively

unreasonable." Est. of Taylor v. Salt Lake City, 16 F.4th 744, 759 (10th Cir. 2021) (quoting Sturdivan ex rel. Est. of Larsen v. Murr, 511 F.3d 1255, 1259 (10th Cir. 2008)). In determining whether a particular use of force was objectively unreasonable, we consider three non-exclusive factors set forth by the Supreme Court in Graham v. Connor: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" McCoy v. Meyers, 887 F.3d 1034, 1045 (10th Cir. 2018) (quoting Graham, 490 U.S. at 396) (alteration in original).

The first Graham factor, the severity of the crime, weighs against reasonableness: McCoy was nonviolently trespassing. To be sure, when it became clear that McCoy would not leave voluntarily, some force was required to remove him from the premises. But deadly force will generally not be appropriate in a case of nonviolent misdemeanor trespass, which is not overly serious nor threatening. See Fogarty, 523 F3d at 1160 (finding officers' force unreasonable for misdemeanor arrest); see also Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 174 (6th Cir. 2004) (describing trespass as "a minor offense and certainly not a severe crime that would justify the amount of force used"). The other two Graham factors form a central part of the dispute between the parties: whether and when McCoy was resisting arrest and posed a threat to the officers or others. We turn now to address the reasonableness of the force used in the context of these latter two Graham factors.

11

We assess objective reasonableness from the perspective of a reasonable officer on the scene, looking at the totality of the circumstances. Est. of Larsen, 511 F.3d at 1259–60.

> Our "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97. So, we assess the reasonableness of "a particular use of force" from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396.

Andersen, 79 F.4th at 1163. The officers are correct in noting that the leg restraint employed was not definitionally a hog-tie position because McCoy's legs and arms were not bound to each other. See Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001). Nonetheless, the officers kept McCoy's legs in a position similar to that achieved by a hog-tie. It is this position, with the legs bent backwards towards the buttocks, that was dangerous in the circumstances. Id. at 1188–89 (discussing danger of positional asphyxia arising from "pressure on the back and placement in a prone position" that occurs in hog-ties and "analogous" restraints). Likewise, using one's knee to exert significant force on the back of a prone, face-down individual poses a risk of distress. See Weigel v. Broad, 544 F.3d 1143, 1149–50 (10th Cir. 2008). We agree with the district court that these exertions of force, for a substantial duration after McCoy was subdued, could be excessive and objectively unreasonable.

The officers argue that McCoy was not subdued and posed a threat to their safety, and therefore, their force was justified. It is important to note that being handcuffed does not necessarily mean the individual is subdued. See Giannetti v.

12

City of Stillwater, 216 F. App'x 756, 766 (10th Cir. 2007) (unpublished) (finding

continued use of force after handcuffing reasonable when individual "actively

resisted, kicked, and thrashed at the officers").[1]  As long as the individual continues

to struggle, they may still be in the process of, and resisting, arrest.  In the facts of

this case, it is also relevant that McCoy was observably under the influence of a

narcotic; officers in such situations sometimes may be justified in utilizing a greater

degree of force if it reasonably appears that the suspect has therefore become more

unpredictable and presents a greater threat to the safety of the officers or others.  See

Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993) (noting lack of

evidence that individual was under the influence of alcohol or drugs weighed against

finding threat to police or public); Edwards v. City of Muskogee, 841 F. App'x 79,

80 n.2 (10th Cir. 2021) (unpublished). Therefore, up until the point when McCoy

stopped actively resisting, the officer's conduct was objectively reasonable under the

latter two Graham factors.[2]

The district court did, however, find that there was a ninety-second period in

which McCoy was both handcuffed and no longer resisting, and yet the officers

maintained both significant force on his torso and on his legs in a position similar to

that of a hog-tie.  At this point, McCoy no longer posed a threat to the safety of the

---

[1] Although not binding, we find Giannetti's reasoning persuasive.

[2] Additionally, the officers gradually escalated the force used and provided warnings before each stage of this escalation.  See Palacios v. Fortuna, 61 F.4th 1248, 1259 (10th Cir. 2023); see also Ceyala v. Toth, 2020 WL 6947721, at *6 (D. Ariz. Mar. 5, 2020) (unreported).

officers or others, per the second Graham factor, nor was he resisting arrest, per the third Graham factor. Thus, all three Graham factors suggest that the officers' conduct became objectively unreasonable in this ninety-second period, when McCoy exhibited signs of distress and the officers' significant force was no longer reasonably justified.

It is true that "[w]hether an individual has been subdued from the perspective of a reasonable officer depends on the officer having 'enough time [] to recognize [that the individual no longer poses a threat] and react to the changed circumstances.'" McCoy, 887 F.3d at 1048 (quoting Fancher v. Barrientos, 723 F.3d 1191, 1201 (10th Cir. 2013)) (alterations in original). There will not be an exact amount of time that will be "enough" in all cases for an officer to recognize a change in an individual's behavior, as this inquiry is necessarily fact driven. See Fancher, 723 F.3d at 1197, 1201 (finding officer had enough time to recognize and react to changed circumstances between firing first round and subsequent six rounds in a matter of seconds when he "stepped back, felt safer, and noticed Mr. Dominguez slump"); McCoy, 887 F.3d at 1050 (finding time in which suspect was unconscious, handcuffed, zip-tied, and moved to a sitting position enough to recognize and react to changed circumstances). But on the facts before the court, ninety seconds was more than enough time.

Also notable is McCoy's change in behavior upon being put in a face-down position: the contrast between McCoy's initial struggle, in which the officers said he was "abnormally and uncommonly strong," and his subsequent silence and lack of

14

resistance in this ninety-second period could have been an adequate sign of distress for a reasonable officer to recognize. Cf. Jackson v. Wilkins, 517 F. App'x 311, 318 (6th Cir. 2013) (unpublished) (finding, in the context of deliberate indifference, that officers should have perceived potential health risk when suspect went from being "the 'strongest' and 'most physical' person they had ever fought" to "nearly helpless" "in the span of a few minutes"). Though not dispositive, a jury could find that it was objectively unreasonable for the officers to ignore this observable sign that McCoy was in distress.

As the officers assert, circumstances rapidly evolve when effectuating an arrest. And while we recognize that this often requires officers to make split-second decisions without the benefit of hindsight, it is not an excuse to ignore clear signs that an individual is no longer resisting and is in need of medical attention for a prolonged period of time. See Thomas v. Durastanti, 607 F.3d 655, 666 (10th Cir. 2010) (recognizing that "circumstances may change within seconds eliminating the justification for deadly force," but ultimately finding disorientation associated with being hit by a car made any mistake regarding ongoing threat reasonable). An individual's medical condition when subjected to significant force can change quickly, and officers must be attuned to these evolving circumstances and respond appropriately. On this record, we cannot say that it was appropriate for multiple officers to continue to exert significant force on McCoy, employing maneuvers they knew could cause distress, for ninety seconds after he had become subdued.

15

Of course, Appellee Bruner still must prove the excessive force claim at trial. But we hold that a reasonable jury could find a violation of decedent McCoy's Fourth Amendment rights.

Finally, we note that the district court and the parties do not conduct separate qualified immunity analyses for each of the officers involved, despite differences in their actions. Recognizing "the party presentation principle" and its appropriate scope of application, Greenlaw v. United States, 554 U.S. 237, 244 (2008), we adopt this approach as well in resolving this summary judgment appeal. We will not, therefore, engage in individualized analyses of the officers' conduct here as this matter is presently presented to us.

## C. Clearly established that it was unreasonable

Even if their conduct is deemed unreasonable in the instant case, officers are still entitled to qualified immunity if the law did not clearly establish that the conduct constituted a violation of constitutional rights at the time in which it occurred. We conclude, however, that the officers' conduct as accepted for this appeal in the relevant ninety-second period did violate clearly established law. Thus, the officers are not entitled to qualified immunity.

"The Hope decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." Fancher, 723 F.3d at 1201 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). When there is in-circuit precedent that clearly establishes the

16

unlawfulness of the conduct, only one such precedential case is necessary to provide fair notice. See Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015).

Here, the district court relied on the Tenth Circuit case of Weigel, among others. Weigel, decided in 2008, was sufficient to clearly establish the unlawfulness of the officers' conduct at issue here, which occurred in 2020. In Weigel, the individual was involved in an automobile accident with a police vehicle, possibly resulting from Weigel's intoxication. 544 F.3d at 1148. After Weigel was observed acting in a strange way, the reporting officer tackled Weigel to the ground for Weigel's own safety. Id. This led to a larger struggle, involving another officer and bystanders, in which Weigel tried to take the officers' weapons and avoid handcuffing. Id. The officers eventually handcuffed Weigel, though he continued to struggle. Id. While still face-down on the ground, the other officer applied force via his knee to Weigel's upper torso, one bystander laid across Weigel's legs, and a second bystander wrapped plastic tubing around Weigel's feet. Id. At this point, the reporting officer returned to his vehicle to warm his hands. Id. at 1149. Witnesses, including the reporting officer, indicated that Weigel was subdued when the reporting officer returned to his vehicle. Id. Yet, the other officer continued to apply pressure to Weigel's back with his knee. Id. When the reporting officer returned, they rolled Weigel onto his back and recognized that he was in full cardiac arrest. Id.

This court determined that the officers were not entitled to qualified immunity because their actions violated Weigel's Fourth Amendment rights that were clearly established as of 2002, id. at 1147, 1151–53: "the pressure placed on Mr. Weigel's

17

upper back as he lay on his stomach created a significant risk of asphyxiation and death" and reasonable officers should be familiar with these risks. Id. at 1152. The court also explicitly stated that an individual's "apparent intoxication, bizarre behavior, and vigorous struggle ma[k]e him a strong candidate for positional asphyxiation." Id. (citing Cruz, 239 F.3d at 1188–89 (10th Cir. 2001)). Rather than applying force to a prone individual's back, officers should "roll a suspect off of his stomach and onto his side as soon as he is cuffed." Id. at 1150. Here, the officers rolled a handcuffed, intoxicated McCoy onto his stomach and applied significant pressure on his upper back. These actions ran afoul of Weigel's guidance.

The officers argue that Weigel cannot have clearly established that their conduct was unconstitutional because, in Weigel, the individual's legs were bound, whereas McCoy's were not. We are not persuaded by this distinction. To reiterate, the purpose of this inquiry is not to search for a case with identical facts, but instead to determine if a reasonable officer would have known their conduct was unconstitutional. Weigel itself, which found that force exerted upon the torso was unreasonable when the suspect was subdued, concluded that Cruz, in 2001, had clearly established the unlawfulness of the conduct. Id. at 1154. Yet, in Weigel the individual's ankles were wrapped—though not tied together—with plastic tubing, id. at 1159 (O'Brien, J., dissenting), whereas the individual in Cruz had been hog-tied, 239 F.3d at 1186. Weigel did not say that these two instances were identical, but rather that the principle drawn from Cruz was that once an individual was subdued, applying force to their back while prone is unreasonable. 544 F.3d at 1154.

18

To be sure, the concurring opinion in Weigel distinguished between when the individual's legs were bound and when "the only restraint on his legs was the weight of a bystander sitting on them." Id. at 1155 (Hartz, J., concurring). But this does not support the officers' contention that the force used is only unreasonable when an individual's legs are bound. Again, we look for the principle reasonable officers must draw from the law, not identical facts. When the plastic tubing was wrapped around Weigel's feet, he was subdued—evidenced by the officer leaving the individual, entrusting this restraint as sufficient to eliminate any danger. Id. at 1149, 1154. Here, the district court determined that McCoy was subdued in the ninety-second period when he stopped resisting and his legs, though not tied together, were restrained in a method notably akin to the hog-tie deemed unreasonable in Cruz.

This court has already set out in other cases what Weigel clearly established was unconstitutional. In McCoy, we held that Weigel, among other cases, had clearly established the unreasonable, unconstitutional nature of "the use of force without legitimate justification, as when a subject poses no threat or has been subdued." 887 F.3d at 1052. To be sure, the facts in McCoy differ in some aspects from the facts here, but McCoy and the cases it relied on "all share the decisive factual circumstance that the defendants used excessive force on the plaintiff when he was already subdued." Id. at 1052–53. Likewise, in Estate of Booker v. Gomez, 745 F.3d 405 (10th Cir. 2014), we concluded Weigel clearly established that applying pressure to the back of a handcuffed individual was unconstitutional, Est. of Booker, 745 F.3d at 424, in a case in which the individual's legs were apparently not bound

19

together.  Id. at 413–14.  As a result, it was clearly established in 2020 that the officers' conduct violated McCoy's constitutional rights, due to the force applied to his upper back and the restraint placed on his legs being similar to a hog-tie, even if his legs were not bound together.

## V. CONCLUSION

The district court determined, and the record does not contradict at this stage of the proceedings, that for a period of ninety seconds, McCoy was handcuffed and subdued, and yet the officers continued to apply excessive force while McCoy was prone.  This force came in the form of a knee in his back and a leg restraint similar in effect to a hog-tie, which are known to pose significant risks.  This use of force was excessive, and the law clearly established it was a constitutional violation at the time, meaning the officers are not entitled to qualified immunity.

Accordingly, we conclude that the district court correctly denied summary judgment as to the excessive force claims against the officers.  The judgment of the district court is AFFIRMED, and we REMAND this case to the district court for further proceedings consistent with this decision.

*Bruner* v. *Cassidy, et al.*, No. 23-6216
**ROSSMAN,** J., concurring

I respectfully join in full Parts I, II, III, and IV(A) of the majority opinion. On the matter of qualified immunity, I agree with the majority opinion's outcome, but my analysis is different.

Since at least *Weigel* v. *Broad*, it has been clearly established in this circuit that kneeling on a prone person's back after they are subdued is a constitutional violation "due to the significant risk of positional asphyxiation associated with such actions." 544 F.3d 1143, 1155 (10th Cir. 2008). As Ms. Bruner's arguments on appeal make clear, this alone suffices to affirm the district court's disposition. *See* Aplee. Resp. Br. at 4–6. We therefore need not take up the issue of the leg restraints.